667 So.2d 1144 (1995)
STATE of Louisiana in the Interest of the ARDOIN Children, Plaintiff-Appellee.
No. 95-839.
Court of Appeal of Louisiana, Third Circuit.
December 20, 1995.
Rehearing Denied February 26, 1996.
Leah Antoinette Beard, Lafayette, for State.
Kent Steven DeJean, Eunice, for Ardoin Children.
Viel P. Caswell, Jr., Eunice, for Charles, Joseph Bernard (Father).
Daniel Phillip Fontenot, Eunice, for Jesse Thomas (Father).
Kearney Tate, Eunice, for Shelton Gallow (Father).
Vernon C. McManus, Eunice, for Debra Ardoin (Mother).
Before COOKS, WOODARD, AMY, SAUNDERS and SULLIVAN, JJ.
*1145 COOKS, Judge.
D.A., the mother of the children who are the object of this proceeding, appeals from a judgment terminating her parental rights to her four daughters. We reverse, finding the State did not meet the burden of proof required to terminate parental rights.

FACTS
The mother, D.A., was born in August of 1966. She gave birth to seven children, born in 1980, 1985, 1986, 1987, 1988, 1989 and 1991. Multiple fathers are involved. The State of Louisiana, through the Department of Social Services, became involved with D.A. sometime in 1988 in response to a complaint alleging the oldest child was not adequately clothed. After investigation, the Department was unable to substantiate the complaint.
The Department also received a complaint on March 9, 1989, that the child born on December 5, 1988 was not "thriving" because the child had gained very little weight since birth. After investigation, the Department concluded this complaint was valid. The child was hospitalized for six days to increase her weight. After discharge, the child's weight began to drop and she was readmitted to the hospital on March 29, 1989. Subsequent to the child's second hospital stay, the Department filed a petition for her removal from the mother. On April 3, 1989, the juvenile court placed the child in the custody of the State of Louisiana, Department of Social Services. On May 11, 1989, the child was adjudicated in need of care by the juvenile court. As required by law, the juvenile court conducted "periodic dispositional reviews," and maintained the child in the custody of the State.
On January 26, 1990, the State investigated an allegation of sexual abuse concerning one of the children. This allegation was not substantiated. However, the Department found evidence that the children were suffering from physical neglect, medical neglect and inadequate shelter. The State petitioned the juvenile court for removal of the five remaining children. On February 13, 1990, their custody was awarded to the State. On March 29, 1990, the five children were adjudicated in need of care. Following "periodic dispositional reviews," the court maintained the custody of all the children found in need of care with the State. The State has not initiated any proceeding to remove the youngest child born in 1991.
Eventually, the State filed a petition seeking to terminate the mother's parental rights to the six children in its custody. After trial the juvenile court rendered judgment terminating D.A.'s parental rights to her four daughters, born in 1986, 1987, 1988 and 1989. However, as to the two sons born in 1980 and 1985, the juvenile court dismissed the proceedings finding the boys' ages realistically made them less suited for adoption.
D.A. appealed the judgment of the juvenile court alleging the following assignments of error:
1. The juvenile court erred in adjudicating the children in need of care.
2. The juvenile court erred in terminating her parental rights to her four daughters.

ANALYSIS
The rights of a parents to the companionship, care, custody and management of their children is a fundamental liberty interest warranting great deference and protection under the law. Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). This State's legislature has imposed statutorily strict procedural and evidentiary requirements which must be met before issuance of a judgment terminating parental rights. State in the Interest of JL, 93-352 (La.App. 3 Cir. 5/18/94); 636 So.2d 1186. In addition to requiring proof by clear and convincing evidence, the legislature has set forth certain conditions which must be met before parental rights are terminated.
Seeking to terminate D.A.'s parental rights, the State relies on Louisiana Children's Code Article 1015(5). This subsection states:
(5) Prior adjudication as a child in need of care and removal from the parental home
a) One year has elapsed since a child was removed from the parent's custody pursuant to a court order in a child in need of *1146 care proceeding and placed either in the custody of an agency or individual.
b) The parent is now unfit to retain parental control, and there is no reasonable expectation of his reformation in the foreseeable future.

c) The department has made every reasonable effort to reunite the child with his parents to no avail but now recommend that reunification would not be in the best interests of the child. (Emphasis added)
As the Louisiana Supreme Court in State in Interest of L.L.Z. v. M.Y.S., 620 So.2d 1309 (La.1993), stated "before parental rights can be terminated, the State must prove, by no less than clear and convincing evidence, that all the elements of at least one subsection of R.S. 13:1601 A through F [now found in the Louisiana Children's Code article 1015 subsections 1 through 6] have been met." To satisfy the conditions of Subsection 5 the State must prove all the elements by clear and convincing evidence in subparts a through c and recommend that reunification with the parent would not be in the children's best interest. First, the State must establish the children have been adjudicated in need of care and placed in its custody for at least one year after removal from D.A.'s care. We are satisfied the State has established the conditions in subpart a. However, subpart b requires that the State also prove D.A. is unfit to retain parental control of her children and there is no reasonable expectation of her reformation in the foreseeable future. While the record supports a finding that the children are in need of care, it does not contain evidence which clearly and convincingly establishes D.A. is unfit and no reasonable expectation exist that she will be able to care for the children in the future.
Unfit is defined in article 1003 as "any of the following behaviors or conditions of a parent:
a) Who has abused a child by inflicting physical or mental injury which causes severe deterioration to the child, or who has sexually abused, exploited or overworked a child to such an extent that his or her health or moral or emotional well-being is endangered.
b) Who has consistently refused to provide reasonably necessary food, clothing, appropriate shelter, or treatment either by medical care or other health services in accordance with the tenets of a well-recognized religious method of healing with a reasonable proven record of success. Financial inability alone shall not constitute grounds for termination of parental rights.
c) Whose medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, substance abuse, or chemical dependency makes the parent unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior."
It is undisputed D.A. has fought to retain parental rights over her children. She has cooperated with the State, committed no intentional acts of abuse or neglect toward them; and, she has demonstrated genuine love for them. Her only "failures" as a parent are solely attributable to her financial and mental limitations. Her mental handicap is an accident of birth. D.A. like her mother is mildly retarded. Her poverty is not a new development; but one which has existed for generations in her family. D.A.'s mental inability serves as an irreversible impediment to her successfully entering the job market and improving her financial status. The only and most precious gifts in D.A.'s life are her children. The law does not permit us to prematurely take from her what nature has kindly bestowed her.
Many of the problems D.A. faced in caring for the children admittedly were caused by her meager financial condition. Mary Lamonte, an OCS employee called as a witness by the State, confirmed:
The family was very poor. There was no denying that the child who went to school, I think there once was a referral he had on six layers of clothing but not a coat. Uh, poverty was there.... Mom had a hard time keeping herself eligible for other government programs like food stamps and I believe Aid to Dependent Children Assistance for some of the children. She had *1147 difficulty following through on some of the requirements that she was asked to do.
The law prevents us from judging D.A. unfit solely because of her poverty. The record also must contain clear and convincing evidence that D.A.'s mental deficiency not only renders her presently unable to adequately care for her children but no reasonable expectation exists that she will be able to do so in the future. While Dr. Buxton found D.A. is severely limited mentally and expressed doubts regarding her ability to parent her children in the future without adult assistance, he also stated with intensive training over a number of years her ability to care for them may improve. Dr. Buxton's testimony does not affirmatively and clearly establish no reasonable expectation exists that D.A. will reform in the future. Moreover, the record contains positive testimony that D.A.'s parenting abilities, when closely supervised, have improved in the past. D.A. has cared for the needs of her youngest child without intervention or assistance; and, the State has not filed any petition to remove him from her custody. The trial judge's ruling dismissing the State's petition to terminate D.A.'s parental rights to her two sons further convinces us the State failed to prove she is "unfit to retain parental control" of her children. The record does not contain any evidence suggesting D.A.'s ability to care for her children is less or greater depending on their sex. We conclude the record does not establish clearly and convincingly that D.A. is presently unfit and no reasonable expectation of her future reformation exist. Without such proof, we cannot affirm the trial court's decision to terminate her parental rights.

DECREE
For the above reasons, the judgment of the lower court terminating D.A.'s parental rights to her four daughters is reversed. Custody of the four daughters shall remain with the State. No costs shall be assessed against the State. La.R.S. 13:4521.
REVERSED.
WOODARD, J., dissents and assigns written reasons.
SULLIVAN, J., dissents for the reasons assigned by Judge WOODARD.
WOODARD, Judge, dissenting.
I respectfully dissent. We are bound by the manifest error/clearly wrong standard of review, and there is an abundance of evidence to support the trial court's ruling. The record reveals that a mother with the mental age of a 10-year-old has exhibited "an established pattern of behavior" potentially dangerous to her children and that her behavior and mental incapacity warrant termination of her parental rights for the safety and well being of these children.
While empathy for this mother is understandable, this is about the needs and best interests of the children, not those of the mother. A collage of excerpts from the record, gleaned from a briefest sampling of testimony by social workers on behalf of the State, teems with concerns about this mother's lamentable deficiencies as a parent:
It was total chaos. She was unable to manage the children ... [t]he children just don't respond to her ... I do not think that Debra has the ability to provide a safe home for the children ... [the children] were usually dirty and poorly dressed, and they appeared to be malnourished ... a lot of adult males ... coming in and out of the home ... gambling, drinking, cursing, fighting ... [t]here was a gas heater ... [without] a guard ... in one of the bedrooms, there was a bowl of urine with cigarette butts floating in it ... [t]he house had been without running water ... the bathroom facilities were filthy and unfunctional... [t]he tub had a layer of silt in the bottom of it ... there was no refrigerator... the front door was broken ... [a]nybody could have broken in at any time ... a newborn baby, and ... a large fan to keep the house cool and I had ... to tell her please put a guard on the fan ... and I said, "If the baby wakes up and raises his arm, we're going to have meat and blood all over this room," [but she never put up the guard]. [Emphasis added.]
One has to read only a few pertinent pages of the transcript of testimony of the social *1148 workers, for example, Pages 141 through 144, taken in conjunction with Dr. Buxton's medical findings and opinion, to know that this mother could not have undergone the radical change in character and capacity alleged by her and on her behalf, that she still cannot and will not care for these children, and that the trial judge had more than enough evidence to support her finding.
Much attention is devoted to the mother's poverty, the implication being that a parent should not lose her right to parent because of it. I agree. And, although there is evidence of poverty, poverty was not the basis for the lower court's ruling. Instead, the court considered whether this mother is mentally ABLE "to provide an adequate permanent home for the child[ren] at the present time or in the reasonably near future based upon EXPERT OPINION or an ESTABLISHED PATTERN OF BEHAVIOR." The views of the only expert in the case, Dr. Buxton, a clinical psychologist, as stated in his testimony and report, taken in toto and not selectively and out of context, are that she realistically is not mentally capable, now, or in the future, of safely exercising her parental rights. In fact, he expects that her mental ability will deteriorate over time.
Like any 10-year-old, she may be taught how to clean and cook. And indeed, the mother's attorney put on testimony from a multitude of lay witnesses, mostly close relatives and friends, such as her mother, that now she was able to do that; that, thus, she was a "changed" woman since the state had removed her children from her care in 1990; but that, now, she and her house were neat and clean. I point out, however, that Dr. Buxton, on the contrary, testified that when he saw her in 1993, he found no change in the confines of her limited mental and emotional capacity. Nor did the defense bring forth any person qualified to refute him. The lower court, who is in a better position to evaluate credibility, discounted the testimonies of the lay witnesses. In relying heavily on Dr. Buxton's evaluations and opinion, as the judge stated in her reasons for judgment, and obviously, in finding of paramount importance the mother's gravely deficient mental and emotional abilities, determined that it was in the best interests of these children to terminate this parent's rights.
Far more than the desire to be with the children and the ability to cook and clean are needed for the protection and well-being of young children who cannot provide for themselves, even though at least one is trying to do so. I was particularly struck by a social worker's recount that one of the little girls was anxious to be free of this situation with her mother so that she could be adopted, and the child was in fact taking it upon herself to solicit her own adoptive parents.
It is a harsh, even unpalatable truth, but a truth nevertheless, that however much this mother wants to have these children with her, she is not ABLE to have them in her care without subjecting them to grave risk. Indeed, how could a 10-year-old be expected to provide the emotional and physical needs for another child, let alone SEVEN children, collectively and day after day? Who among us would risk our children to the "supervision" of a 10-year-old for even one day?
I believe the trial court had no other reasonable choice for the protection of these children than the difficult decision she rendered.