HANS J. LILJEBERG, Judge.
|sThe State of Louisiana, Department of Children and Family Services, appeals the trial court’s denial of its petition to terminate the parental rights of M.W.V and A.H.V. For the following reasons, we reverse.

Factual & Procedural History

On May 24, 2011, A.V. (D.O.B. 9/12/OB), T.V. (D.O.B. 08/12/05), and C.V. (D.O.B. 11/22/10) were placed in the custody of Louisiana Department of Children and Family Services (“DCFS”) following a report that M.W.V. was found wandering the streets with her three children unaware of her surroundings and begging for food. A prior report was received on May 6, 2011, which stated that M.W.V. was admitted to New Horizon Acute Psychiatric Unit in Mamou, Louisiana, due to suicidal thoughts and threats to harm her children. M.W.V. was diagnosed with Bipolar disorder and mild retardation. M.W.V. was noted to not take her psychiatric medication as prescribed as she did not like the side effects. Through further investigation, DCFS learned that on May 20, 2011, M.W.V. left A.V., age seven, to care for his younger siblings, T.V., age five, and C.V., age six-months, while she walked to the Kart N Karry store. Another report was validated in 2009, when the children were found in the road. M.W.V. admitted leaving the children alone at home while she went to the store with a friend. Two earlier 14reports in 2006 and 2007 of lack of supervision and dependency resulted in A.V. and T.V. being placed in foster care for approximately one year.[1] While the children’s father, A.H.V., has always been a part of the household, he works long hours and is not present in the home with M.W.V. and the children during the day and sometimes on weekends. There were additional allegations of domestic abuse in the home.
Based upon these allegations, Judge Mary Hotard Becnel signed an Instanter Order on May 26, 2011, placing the children in the temporary custody of the state. On September 21, 2011, Judge Madeline Jasmine declared the family in need of services. The children have remained in the custody of the state throughout these proceedings.
Initially, DCFS formulated a court-approved case plan outlining a strategy for reunification of the family; however, the DCFS case plan thereafter changed from reunification to adoption based upon the fact that A.H.V. failed to adequately develop a plan that would ensure the safety of the children during his absence from the home.
On January 2, 2013, pursuant to La. Ch.C. art. 1004.1[2], DCFS filed a petition *856 to terminate the parental rights of the biological parents, M.W.V. and A.H.V., of their three children, A.V., T.V., and C.V. After a trial on the merits held on October 30, 2013, the trial court denied the state’s petition and rendered a judgment with reasons on April 22, 2014. DCFS now appeals.

Assignment of Error

| ¿On appeal, DCFS asserts that the trial court erroneously denied the state’s petition to terminate parental rights, where DCFS met its burden by clear and convincing evidence and where termination is in the best interest of the children.

Law & Analysis

The Louisiana Supreme Court recognizes that in any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. State ex rel. L.B. v. G.B.B., 02-1715 (La.12/4/02), 831 So.2d 918, 921; State ex rel. J.A., 99-2905 (La.1/12/00), 752 So.2d 806, 811. The United States Supremé Court also recognizes that parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and requiring vigilant due process protection under the law that fair procedure be followed when the State seeks to terminate the parent-child legal relationship. Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); Lassiter v. Department of Soc. Sens., 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). Balanced against those protections is the child’s profound interest in terminating parental rights which prevent adoption and inhibit the establishment of secure, stable, long-term, and continuous relationships found in a home with proper parental care. State ex rel. J.A., supra, citing Lehman v. Lycoming County Children’s Serv.’s Agency, 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982); see also, State in the Interest of S.M., 98-0922 (La.10/20/98), 719 So.2d 445, 452. In balancing the parents’ and the child’s interests, Louisiana courts have consistently found “the interests of the child to be paramount over those of the parents.” State ex reí. L.B., supra. See also e.g., State in the Interest of S.M., supra; State in the Interest of AE., 448 So.2d 183, 186 (La.App. 4th Cir.1984); State in the Interest of Driscoll, 410 So.2d 255, 258 (La.App. 4th Cir.1982).
| ¿The state’s parens patriae power allows intervention in the parent-child relationship only under serious circumstances, such as where the state seeks the permanent severance of that relationship in an involuntary termination proceeding. State ex rel. L.B., supra at 922, citing State ex rel. J.A., supra at 811. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. Id. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. Id. As such, the *857 primary concern of the courts and the state remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Id.
Title X of the Louisiana Children’s Code governs the involuntary termination of parental rights. Louisiana Children’s Code Article 1015 provides the specific statutory grounds by which a court may involuntarily terminate the rights and privileges of parents. In order to terminate parental rights, the court must find that the state has established at least one of the statutory grounds by clear and convincing evidence. In re State ex rel. D.C.P., OS-212 (La.App. 5 Cir. 10/6/05), 916 So.2d 1206, 1208-09; State ex rel J.A., supra at 811; La. Ch.C. art. 1035(A). Further, even upon finding that the state has met its evidentiary burden, a court still must not terminate parental rights unless it determines that to do so is-in the child’s best interest. La. Ch.C. art. 1037; State ex rel G.J.L., 00-3278 (La.6/29/01), 791 So.2d 80, 85.
17An appellate court reviews a trial court’s findings as to whether parental rights should be terminated according to the manifest error standard. State in the Interest of E.I.R., 13-450 (La.App. 5 Cir. 11/19/13), 130 So.3d 360, 373; State ex rel. K.G., 02-2886 (La.3/18/03), 841 So.2d 759, 762.

A. Grounds for Termination of Parental Rights Under La. Ch.C. art. 1015

In this matter, DCFS sought termination of parental rights under La. Ch.C. art. 1015(5), which provides:
Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
In its petition to terminate rights under La. Ch.C. art. 1015(5), DCFS asserted that at least one year has elapsed since the children were removed from the parents’ custody and there has been no substantial parental compliance by the mother or father with the court-approved case plan for the safe return of the children, to wit:
2. The parents have failed to develop a support system through the assistance of relations or friends so that the children are not left alone with the mother who is mentally challenged and does not possess the capacity to safely parent her children day to day when the father is at work or otherwise away from the family.[3]
The petition further alleges that there is no reasonable expectation of" significant improvement in the parents’ condition or conduct in the near future considering the children’s ages and'their need for a stable and permanent home, to wit:
*858 ¡4. The parents have a pattern of conduct which makes them unable and unwilling to provide a safe permanent home for the children, including but not limited to:
a. The family has a history of involvement with Agency, including a valid report for Dependency and Lack of Supervision for which the - family was provided Family Services by DCFS from 12/6/06 to 7/11/07. On September 5, 2007, the children entered foster care as a result of a valid report for Lack of Supervision and Dependency and the children remained in foster care until 7/22/08;
b. The parents continue to live in a home that is not safe for the children; [4]
c. Despite repeated Department involvement with this family and the provision of a variety of services the parents have failed to create a support system so that the children are not left alone in the mother’s care and supervision.
2. The children range in age from 2 to . 9 years old and have been in DCFS custody for 18 months. The children need a stable and permanent home and cannot wait any longer for their parents to provide a safe and stable home.
Under Article 1015(5), lack of parental compliance with a ease plan may be evidenced by one or more of the following:
(1) The parent’s failure to attend court-approved scheduled visitations with the child.
(2) The parent’s failure to communicate with the child.
(3) The parent’s failure to keep the department apprised of the parent’s whereabouts and significant changes affecting the parent’s ability to comply with the case plan for services.
(4) The parent’s failure to contribute to the costs of the child’s foster care, if ordered to do so by the court when approving the case plan.
(5) The parent’s repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent’s lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
La. Ch.C. art. 1036(C). Moreover, lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future may be evidenced by:
|fl(l) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
La. Ch.C. art. 1036(D).
As indicated above, upon the children’s placement into state custody, DCFS filed a case plan, which was approved by the trial court and provided to M.W.V. and A.H.V., outlining the necessary action to be taken to accomplish the safe return of the chil *859 dren to their custody. The court-approved case plan required that M.W.V. complete the following:
(1) Establish a safe and stable housing for the minor children that was hazard free for at least six consecutive months;
(2) Provide the agency with names of relatives who may serve as caregivers for the children;
(3) Participate in counseling/medication management to address her mental health diagnosis;
(4) Participate in anger management;
(5) Attend all FTCs, court hearings and visits with children, giving positive and appropriate attention to the children; and
(6) Locate a source to help with the supervision of the children while the father is out of the home.
Further, the case plan required that A.H.V.:
(1) Maintain safe and stable housing;
(2) Obtain legal income to enable him to provide resources for the children;
(3) Demonstrate fiscal responsibility by-contributing payments towards the cost of the children’s care while in foster care;
(4) Participate in anger management;
(5) Attend court hearings, FTCs, and visits with the children; giving positive and -appropriate attention to the children; and
(6) Locate a source to help with the supervision of the children while he is out of the home.
In its reasons for judgment denying the state’s petition to terminate parental rights, the trial court found that DCFS failed to prove by clear and convincing evidence the statutory requirements of La. Ch.C. art. 1015(5). Although | ^acknowledging that the children had been in the custody of the state for at least one year, the trial court reasoned that the totality of the circumstances revealed that the delay was not entirely the fault of the parents. The trial court further reasoned that the parents mostly complied with the case plan and that M.W.V.’s mental condition had improved with treatment and medication. The trial court also determined that terminating the rights of the parents was not in the children’s best interest, despite acknowledging that all expert testimony revealed that M.W.V., even with improvement, could not care for the children on her own and despite acknowledging that the court- had no intention of returning the children to their home after being in the state’s custody for three years. We find that the trial court’s findings are manifestly erroneous in light of the testimony and evidence elicited at trial as well as the length of time the children have been in state custody.
At the trial on the merits of the state’s petition, several experts testified as well as DCFS case workers. While we agree with the trial court that evidence did reveal that M.W.V. and .A.H.V. complied with their case plan in completing classes and counseling and attending visits and court hearings, the most important and key component to the case plan to ensure the safe return of the children has been left unaddressed by these parents for several years — that component being the procurement of a third-party caretaker to assist M.W.V. with the care of their children while A.H.V. is away from the home.
Testimony and evidence at trial were consistent and unrebutted that M.W.V. is unable to care for the children on her own. M.W.V. suffers from Bipolar Disorder and mild mental retardation. While she shows love for her children, her condition causes her to become paranoid, afraid, and ag *860 gressive. She is prone to emotional outbursts, potentially violent, and possesses an inability to tolerate frustrating situations leading to inappropriate interactions. She has limited insight l^as to her children’s basic needs and has left the oldest son to care for his younger siblings. The children love her but are mostly consumed with their mother’s well-being rather than the opposite. When the children entered foster care, C.V., only six-months old, was significantly overweight with his head flat in the back, indicative of M.W.V.’s failure to pick him up, and has required many types of developmental therapies. A.V. acted out sexually and indicated that he witnessed sexual acts between his parents. He also reported being bullied and molested at school, both of which were left unaddressed by the parents for some time. Both A.V. and T.V. were later diagnosed with ADHD, which went unaddressed by the parents. The older children hoarded food and over-ate indicating that they were not fed regularly. The children also flinched at affection from their foster parents, an indication that they were previously hit. Both older children reported domestic abuse in the home, wherein A.V. witnessed their mother being injured, reported being injured himself, and witnessed physical damage to their home. Dr. Amy Dickson, clinical psychologist, testified that if returned to the care of their mother, the children would be at risk to sustain severe developmental delay and physical harm.
Dr. Andrew Morson, forensic psychiatrist, treated M.W.V. for the year prior to trial. He testified that M.W.V. has been medication compliant and has attended all of her appointments. While he testified that M.W.V.’s condition has been tempered with medication, she remains unable to independently take care of herself or her three children. He further opined that M.W.V.’s condition is unlikely to resolve in. the foreseeable future, stating that her cognitive deficits are permanent. Dr. Morson’s testimony was corroborated by Dr. Barbara Hamm, a general and child psychiatrist, who treated M.W.V. for a period of months prior to | ,2Dr. Morson, at Magnolia Family Services. She, too, opined that M.W.V., even with the help of medication, cannot independently care for herself or her children.
Dr. Jesse Lambert, clinical psychologist, evaluated both M.W.V. and A.H.V. in September 2011. Dr. Lambert testified at trial that he concurred with both Dr. Mor-son’s and Dr. Hamm’s assessment of M.W.V. He further testified that he found A.H.V. to be diagnostically sound, but was primarily concerned with his ability to assist his wife in caring for the children. Due to M.W.V.’s condition, Dr. Lambert testified that it would be necessary for A.H.V. to be the primary caregiver as he is the only biological parent capable of providing or procuring sufficient support to be in place for the care of the children, which was impossible due to A.H.V.’s work obligations.
Delicia Brown, a DCFS child protection investigator, testified to the history of the family with the agency. She testified that DCFS intervened on behalf of the children in 2006, 2007, 2009, and 2011. She explained that each event involved the lack of supervision of M.W.V. of the children while A.H.V. was away from the home. Ms. Brown further testified that after the report in 2007, A.H.V. expressed concerns about his wife’s ability to manage and care for his children. The children remained in state custody until 2008, at which time they were returned to the parents with the understanding that A.H.V. would find alternative childcare assistance; however, the agency had to intervene again in 2009, when A.V. and T.V. were found wandering the streets after M.W.V. left them alone. *861 Then in May 2011, A.V., T.V., and C.V. entered state custody after they were found in the street with M.W.V. begging for food, and A.H.V. was unreachable.
Ms. Monique Mitchell, a DCFS child welfare specialist and the family’s foster care worker, testified that A.H.V. works as a mechanic in New Orleans East, approximately one hour and 20 minutes away from his home in LaPlace, | ^Louisiana. As a result, A.H.V. spends significant periods of time away from his family during the week, and sometimes on the weekends, leaving the children in the care of their mother, despite expressing concerns regarding her ability to care for them. Ms. Mitchell testified that A.H.V. reported that he receives a base salary of $24.00 per hour or $600.00 per week plus commission, and M.H.V. receives $740.00 per month from Social Security. Accordingly, Ms. Mitchell testified that A.H.V. did not meet the income requirements for monetary assistance for childcare. Both Ms. Mitchell and Ms. Brown testified that A.H.V. maintained that he could not afford childcare despite the family’s income, although Ms. Mitchell testified that she observed a new laptop computer and a new Kindle in the home while the children were in foster care. Further, although the court ordered A.H.V. to deposit $150.00 per month into a bank account as a means to save money for childcare, A.H.V. routinely deposited the funds and then withdrew the money days later. At the time of trial, only $4.00 remained in the bank account.
Ms. Mitchell further testified that while A.H.Y. gave a list of names to DCFS to possibly assist with the children’s care, none of the persons listed would agree to commit to the conditions necessary for the safe return of the children.
Further testimony revealed that the state exhausted all efforts to render assistance to the parents to better their situation so that the family could be reunified. While the trial court was correct that the family did not qualify for many services, the record is clear that the state made sufficient efforts to help the family. Importantly, Ms. Mitchell testified that no service exists that would provide a caretaker for the children in the home.
Considering the foregoing testimony, we find that the trial court erred in finding that the state failed to prove by clear and convincing evidence the statutory elements to terminate parental rights under La. Ch.C. art. 1015(5). DCFS clearly | ^established that at least one year has elapsed since the children were removed from the parents’ custody. The children entered state custody in May 2011; therefore, at the time of the hearing, almost two and one-half years had elapsed. Further, we find that the trial court erred in finding that the state failed to prove that there was no substantial parental compliance with the case plan. As outlined above, while the parents complied with some of the plan, neither parent complied with the key component to ensure the safe return of their children. Under La. Ch.C. art. 1036(C), lack of parental compliance may be evidenced by “the persistence of conditions that led to removal or similar potentially harmful conditions.” We find that the state proved by clear and convincing evidence that after two and one-half years, A.H.V. still could not provide an alternative to leaving his children alone with M.W.V., despite having his own concerns as to her abilities and despite earning a modest income. The record reflects that A.H.V. contributed only $910.00 toward the care of his children during the time the children were in foster care prior to trial, and maintained that he still could not afford daycare despite a family income of approximately $3,100.00 per month. Because A.H.V. has not shown the ability to *862 provide safe childcare for his children in lieu of leaving the children alone with their mother, who is unable to care for them, since 2006, we further find that the state proved by clear and convincing evidence that there is no reasonable expectation of significant improvement in the condition that led to the removal of the children. See La. Ch.C. art. 1036(D). Accordingly, we find that the state met its burden by clear and convincing evidence the statutory elements of La. Ch.C. art. 1015(5).

B. Best Interest of A.V., T.V., & C.V.

After a finding that at least one of the grounds set forth in La. Ch.C. art. 1015 has been established by clear and convincing evidence, the trial court must |1fithen determine whether termination of parental rights is in the best interest of the child.[5] See La. Ch.C. art. 1037(A). Because we find that the state met its burden under La. Ch.C. art. 1015(A), we must now determine whether termination of parental rights is in the children’s best interest.
As stated above, Louisiana courts recognize a child’s profound interest in terminating parental rights which prevent adoption and inhibit the establishment of secure, stable, long-term, and continuous relationships found in a home with proper parental care. In balancing the parents’ and the child’s interests, the interests of the child are paramount over those of the parents.
The children have now been out of the home and in the care of a foster family for three and one-half years. The record fully reflects the physical, behavioral, developmental, and nurturing deficits the children possessed upon entering state custody. All testimony and evidence indicate that the children are now flourishing with their placement m their foster home, physically, emotionally, and developmentally. The children’s foster mother testified at the hearing that she and her husband wish to adopt the children. We cannot find that permanent or long-term foster care is in the children’s best interest. Accordingly, based upon the entirety of the record, we find termination of M.W.V.’s and AH.V.’s parental rights is in the best interests of A.V., T.V., and C.V.
|1fi¿? ecree
Considering the foregoing, the judgment of the trial court is reversed and the matter is remanded to the trial court for further proceedings consistent with this opinion.

REVERSED.

. A 2006 report was received regarding lack of adequate supervision when A.V., then age 3, was found wandering along the highway unattended. In 2007, another report was received when M.W.V. left A.V. and T.V. in the care of a nine-year-old girl.

. La. Ch.C. art. 1004.1, provides that "[t]he department shall file and pursue to judgment *856 in the trial court a petition to terminate the parental rights of the parent or parents if the child has been in state custody for seventeen of the last twenty-two months, unless the department has documented in the case plan a compelling reason why filing is not in the best interest of the child.”

. DCFS additionally asserted that "[t]he parents failed to provide the children with a safe and stable home environment as they have failed to make the necessary physical repairs that would make the home safe for the children.” At the hearing, however, DCFS conceded that M.W.V. and A.H.V. did in fact make the necessary repairs to their mobile home. Therefore, this basis was not before the trial court in determining whether to terminate parental rights.

. See n. 3.

. In the instant matter, the trial court erroneously placed the burden on the state to prove that termination of parental rights was in the children's best interests and therefore erroneously found that the state did not meet its burden.