STATE OF LOUISIANA IN THE INTEREST
OF S. A.

NO. 23-CA-491

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-NINTH JUDICIAL DISTRICT COURT
PARISH OF ST. CHARLES, STATE OF LOUISIANA
NO. 15,381, DIVISION "C"
HONORABLE CONNIE M. AUCOIN, JUDGE PRESIDING

January 31, 2024

**JUDE G. GRAVOIS**
**JUDGE**

Panel composed of Judges Susan M. Chehardy,
Jude G. Gravois, and John J. Molaison, Jr.

**AFFIRMED**
   **JGG**
   **SMC**
   **JJM**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PARENT/APPELLANT,
R. R.
 Jane C. Hogan

COUNSEL FOR MINOR/APPELLEE,
S. A.
 Mary R. Mustaller McMillan

COUNSEL FOR DEFENDANT/APPELLEE,
STATE OF LOUISIANA, DEPARTMENT OF CHILDREN AND FAMILY
SERVICES
 Benjamin R. McDonald

**GRAVOIS, J.**

Appellant, R.R., appeals the judgment of the district court terminating her parental rights as to her minor daughter, S.A. On appeal, she argues two assignments of error:

1. The juvenile court manifestly erred by finding that R.R. had not substantially complied with her case plan, that the Department of Children and Family Services ("DCFS") provided reasonable efforts to achieve reunification, and that there was no reasonable expectation of significant improvement in the near future.

2. The juvenile court erred by finding that termination was in the best interest of S.A.

For the following reasons, we affirm the judgment on appeal.

## FACTS AND PROCEDURAL HISTORY

The minor child, S.A.,[1] a girl whose date of birth is September 11, 2017, was removed from her mother R.R.'s home on December 30, 2019 after the granting of an oral Instanter Order of the same date.[2] S.A. lived with her mother, who was 34 at the time, her mother's boyfriend E.B., III, her brother C.R., and her brother G.F., along with E.B., III's father, in a house rented to him in Des Allemands, Louisiana.[3]

The basis for the Instanter Order was a report of alleged physical abuse/bone fractures received by DCFS on December 26, 2019 concerning S.A., in that she had been seen by the hospital several times recently and R.R. was unable to provide a sufficient explanation for the injuries, which included a broken arm that was rebroken, and possible broken ribs. A Petition for Adjudication was filed by

---

[1] To protect the minor's identity and to ensure the confidentiality of a minor who is a party to or whose interests are the subject matter in the proceedings listed in Rule 5-1(A) or (C) of the Uniform Rules of Louisiana Courts of Appeal, initials shall be used in all filings and in opinions rendered by the Court of Appeal. Uniform Rules of Louisiana Courts of Appeal, Rule 5-2. A proceeding for Involuntary Termination of Parental Rights is listed in Rule 5-1(A).

[2] The oral order was confirmed by a written Instanter Order dated January 2, 2020.

[3] C.R. was approximately six years older than S.A., and lived primarily with his paternal aunt, but stayed with R.R. from time to time. G.F. was approximately 1 year older than S.A. S.A. had both a legal father and a biological father who were contacted by DCFS in this case, but who never participated in this case.

the District Attorney on January 16, 2020, alleging that S.A. had been physically abused by her caretakers (her mother and E.B., III). At the adjudication hearing on February 14, 2020, S.A. was adjudicated to be a child in need of care. Custody was granted to DCFS and the family's assigned DCFS case worker, Natalie Grow-Goudia, testified that the elements of R.R.'s case plan were to address her need for permanent housing, parental education, and mental health, with the goal of reunification. E.B., III was added to the case plan, but did not fully cooperate with DCFS.

S.A. was placed with a foster parent. Shortly after her placement, S.A. was hospitalized for several days for fluid in her lungs. When she was well, visitation was allowed between S.A. and her mother for one hour a week on Fridays. Review hearings were conducted on June 24, July 22, August 14, September 9, and December 15, 2020. On February 3 and April 14, 2021, permanency/review hearings were conducted. Review hearings also took place on June 23, August 25, October 27, November 15, 2021, as well as on February 15, April 27, May 31, and August 31, 2022. Permanency/review hearings also took place on January 12 and February 22, 2023. At these hearings, the trial court heard testimony from the DCFS case workers and the court-appointed special advocate volunteer ("CASA"), and the agency progress reports were admitted into evidence. R.R. was present for the hearings and testified on occasion.

As discussed at the review hearings on June 24 and July 22, 2020, R.R. informed the DCFS caseworker that sometime in May of 2020, she had taken an agency appeal of the finding of physical abuse concerning S.A.'s two broken arms and broken ribs. According to the testimony of Ms. Grow-Goudia, the appeal was returned in R.R.'s favor, overturning the finding of physical abuse.[4] At the June

---

[4] Khia Oden from DCFS testified at the review hearing on June 24, 2020 that although doctors initially told DCFS that S.A. sustained a broken arm and a broken rib, upon further

24, 2020 review hearing, Ms. Grow-Goudia testified that DCFS recommended reunification at that time, with transfer of the case to Family Services. However, the trial court declined at that point to return S.A. to R.R.'s custody, requiring instead that DCFS produce more information regarding the medical findings about the alleged physical abuse and some documentation regarding the appeal. At the July 22, 2020 review hearing, DCFS again recommended returning custody to R.R. and transferring the case to Family Services. The trial court, however, reviewed S.A.'s medical records and noted that she had been hospitalized four times between September of 2019 and January of 2020, and ruled that custody would be maintained with DCFS.

R.R. was assessed in a psychological evaluation on January 13, 2021 by Dr. Christine Powanda, a developmental psychologist, at the behest of DCFS. Dr. Powanda found that R.R. met the criteria for developmental disability, with an IQ in the mild range of intellectual disability. R.R. self reported difficulty with reading. Among other things, Dr. Powanda found that R.R. had difficulty understanding the motives of others, had limited insight into the causes of her difficulties, made poor choices that potentially placed her at risk for exploitation, and was unable to provide for her own economic needs independently. Dr. Powanda recommended that R.R. be referred to the local Office for Citizens with Developmental Disabilities ("OCDD") for eligible services, and recommended that R.R.'s compliance with such services be a prerequisite for reunification with S.A. She also recommended that R.R. participate in regular parenting classes/counseling related to parenting to assist her in retaining information and learning appropriate skills as her children aged.

---

inspection, S.A. did not have a broken rib, and that the reinjury to the broken arm could have happened while her arm was still in the cast.

It is evident that R.R. had made measurable progress in her case plan by the time of the review hearing held on October 27, 2021. At the June 23, 2021 review hearing, it was reported that she had secured stable appropriate housing in New Iberia. S.A.'s case was transferred to the New Iberia DCFS office and she received a new case worker, Donyeill Lanceslin-Gray. By the October 27, 2021 review hearing, R.R. had completed parenting classes with Creative Solutions, and she had started receiving mental health care and medication for anxiety from a practitioner in New Iberia. At this time, the court recommended that the case plan be changed to reunification concurrent with adoption. The court ordered overnight visits every other weekend in November, followed by every weekend in December, at R.R.'s home, with the goal of reunification by January of 2022.

Ms. Lanceslin-Gray reported, however, at the November 15, 2021 review hearing, that she discovered during an unscheduled visit that R.R. had allowed a new boyfriend to move into her apartment without notifying DCFS. After the boyfriend submitted fingerprints, it was discovered that he had a conviction from 2012 for contributing to the delinquency of a minor. DCFS required him to move out of the apartment. The CASA volunteer testified at this hearing that she had visited R.R. in New Iberia while S.A. was there. She noted that it appeared that the boyfriend was gone, but R.R. indicated to her that once the case was closed, she would allow him to move back in.

Further, following the weekend visit by S.A. to R.R.'s home on November 19-21, 2021, the foster mother reported to Ms. Lanceslin-Gray that S.A. had exhibited sexually inappropriate behavior, allegedly trying to insert a toy shark in her vagina at bath time. The foster mother also reported that S.A. told her that this act was something that her brother C.R. had showed her. S.A. also reported to her foster mother that C.R. had touched her inappropriately. This incident occurred at R.R.'s house while R.R was in another room washing dishes, according to

assertions in the record. According to the foster mother, S.A. also disclosed the touching incident to her teacher. On December 2, 2021, the attorney for S.A. filed a motion to suspend visitation with R.R., citing the above incidents, which was granted by the trial judge that same day.

R.R. was evaluated a second time by Dr. Powanda in January of 2022. Following this assessment, Dr. Powanda stated that reunification was not recommended in that she was concerned for the safety of the children in R.R.'s household because R.R. was not able to provide them with the supervision they needed, nor could she ensure appropriate safety. Dr. Powanda also found that R.R. demonstrated rigid thinking in refusing to believe that her son C.R. could have touched S.A. inappropriately, which raised concerns that R.R. was minimizing the safety issues for S.A.

R.R. was recommended to participate in the Extra Mile program of additional parenting classes. She was also referred for services from OCDD, but she never received those services. Initially, R.R. failed to timely send in paperwork for her assessment, which delayed the initiation of services. An agency backlog caused by the Covid-19 pandemic also combined with the delays attributable to R.R. prevented her from receiving those services.

Visitation between R.R. and S.A. continued via FaceTime and/or Google Duo. Progress reports through 2022 show that R.R. started the Extra Mile program, but failed to complete it. Her case with Extra Mile was closed in July of 2022 due to her noncompliance. R.R. also started working part-time at McDonald's, which helped with her finances, but her work schedule interfered with visitation with S.A. in May of 2022. Other visitation with S.A. was missed because of illness to S.A. (April 19, 2022) and to G.F. (March 2, 2022).

In the latter part of 2022, DCFS discovered that R.R. had allowed another individual, a woman named S.B., to move into her apartment. R.R. explained that

she had known S.B. since middle school and that she would be living there only until she received "her benefits." R.R. said that S.B. watched G.F. while she was at work. Initially, S.B. gave a false name to DCFS and lied about why she was there. Fingerprinting and further investigation showed that S.B. had two children who had been removed from her custody.

The reports from R.R.'s case worker shows that she missed scheduled mental health appointments on October 14, October 25, November 9, and November 23, 2022.

S.A. began having "absence" seizures as reported by her foster mother. She was evaluated by a neurologist and started on medication to treat the seizures. R.R. was informed about her daughter's medical condition, but according to testimony at a review hearing on August 31, 2022, she said that she did not need to hear details about it from the caseworker or the foster mother because S.A. had had seizures before she had been removed from R.R.'s custody and R.R. knew how to handle them.

The State filed a petition for termination of parental rights on March 3, 2023. The petition alleged several grounds for termination of parental rights, but at the trial on July 10, 2023, the State orally amended the petition to withdraw the grounds asserted under La. Ch.C. art. 1015(5)(b) and (c) and proceeded only with the grounds asserted under La. Ch.C. art. 1015(6).[5] Following testimony from R.R., Ms. Lanceslin-Gray, Ms. Grow-Goudia, and the foster mother, the trial court orally ruled that parental rights would be terminated as to S.A. regarding R.R, the legal father C.R., and the alleged biological father B.F. A written judgment to this

---

[5] In Acts 2023, No. 271, § 1, effective June 9, 2023, after the petition was filed, this paragraph was renumbered as La. Ch.C. art. 1015(5).

effect was signed by the trial court on July 12, 2023. This timely appeal by R.R. followed.[6]

## BURDEN OF PROOF AND STANDARD OF REVIEW

Permanent termination of the legal relationship existing between natural parents and children is one of the most drastic actions the State can take against its citizens. *State in Interest of A.L.D.*, 18-1271 (La. 1/30/19), 263 So.3d 860, 863, citing *State ex rel. J.M.*, 02-2089 (La. 1/28/03), 837 So.2d 1247, 1254. However, the primary concern of the courts and the State remains to determine and ensure the best interest of the child, which includes termination of parental rights if justifiable statutory grounds exist and are proven by the State. *Id.* As this Court stated in *State in Int. of A.V.*, 14-465 (La. App. 5 Cir. 10/29/14), 164 So.3d 853, 856, *writ denied*, 14-2489 (La. 2/27/15), 160 So.3d 963:

> The Louisiana Supreme Court recognizes that in any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. *State ex rel. L.B. v. G.B.B.*, 02-1715 (La. 12/4/02), 831 So.2d 918, 921; *State ex rel. J.A.*, 99-2905 (La. 1/12/00), 752 So.2d 806, 811. The United States Supreme Court also recognizes that parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and requiring vigilant due process protection under the law that fair procedure be followed when the State seeks to terminate the parent-child legal relationship. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Lassiter v. Department of Soc. Servs.*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). Balanced against those protections is the child's profound interest in terminating parental rights which prevent adoption and inhibit the establishment of secure, stable, long-term, and continuous relationships found in a home with proper parental care. *State ex rel. J.A.*, *supra*, citing *Lehman v. Lycoming County Children's Serv.'s Agency*, 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982); *see also*, *State in the Interest of S.M.*, 98-0922 (La. 10/20/98), 719 So.2d 445, 452. In balancing the parents' and the child's interests, Louisiana courts have consistently found "the interests of the child to be paramount over those of the parents." *State ex rel. L.B.*, *supra*. *See also e.g.*, *State in the Interest of S.M.*, *supra*; *State in the Interest of A.E.*, 448 So.2d 183, 186 (La. App. 4th Cir. 1984); *State in the Interest of Driscoll*, 410 So.2d 255, 258 (La. App. 4th Cir. 1982).

---

[6] Neither father participated in this case, though both were represented and appointed curators. They did not appeal the termination of their parental rights.

The statutory grounds by which a court may involuntarily terminate the rights and privileges of parents are set forth in La. Ch.C. art. 1015. *State in Int. of H.M.R.*, 22-176 (La. App. 5 Cir. 1/11/23), 356 So.3d 1179, 1183-84. In order to terminate parental rights, the court must find that the State has established at least one of the statutory grounds by clear and convincing evidence. La. Ch.C. art. 1035(A); *Id.*, citing *State in Interest of A.V.*, *supra*. "Clear and convincing" evidence requires more than a "preponderance," but less than "beyond a reasonable doubt." Under the "clear and convincing" standard, the existence of the disputed fact must be highly probable or much more probable than its nonexistence. *Id.*, citing *State in Interest of A.L.D.*, 263 So.3d at 863.

Further, even upon finding that the State has met its evidentiary burden, a court still must not terminate parental rights unless it determines that to do so is in the child's best interest. La. Ch.C. art. 1037; *State in Interest of A.V.*, *supra*, 164 So.3d at 857.

In a proceeding for termination of parental rights, the issues of parental compliance with a case plan, the parent's expected success of rehabilitation, and the expectation of significant improvement in the parent's condition and conduct are questions of fact. *State in Int. of H.M.R.*, *supra*, 356 So.3d at 1184. It is well settled that an appellate court cannot set aside a trial court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. *Id.*, citing *State in Interest of E.I.R.*, 13-450 (La. App. 5 Cir. 11/19/13), 130 So.3d 360, 373. Under this standard of review, an appellate court's task is not to determine whether the factfinder was right or wrong, but whether the factfinder's conclusion was reasonable. If the conclusion is reasonable in light of the record viewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Id.*

# FIRST ASSIGNMENT OF ERROR

In her first assignment of error, R.R. argues that the trial court manifestly erred by finding that she had not substantially complied with her case plan, that DCFS provided reasonable efforts to achieve reunification, and that there was no reasonable expectation of significant improvement in the near future.

In this case, the State proceeded under the following specific grounds found in La. Ch.C. art. 1015(5), which requires three findings:

(1) unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order;

(2) there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and

(3) despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

La. Ch.C. art. 1036 provides, in pertinent part, the statutory criteria courts use to determine lack of parental compliance with a case plan:

C. Under Article 1015(6),[7] lack of parental compliance with a case plan may be evidenced by one or more of the following:

\* \* \*

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

\* \* \*

---

[7] As previously stated in footnote 5, Article 1015(6) was renumbered to Article 1015(5) by Acts 2023, No. 271, § 1. It appears that La. Ch.C. art. 1036, paragraphs C and D, should also have been amended to reflect this change, but apparently were not.

D. Under Article 1015(6), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

R.R. argues in brief that the allegations of sexual abuse on S.A. were deemed invalid. She argues that though she was intellectually disabled, she demonstrated her ability to care for her son G.F. throughout the pendency of this case. She argues that each time the case neared reunification, forces "outside of her control" intervened and kept S.A. in foster care. She essentially argues that as she neared reunification, the goalposts were moved against her without justification.

Upon review, as set forth below, we find that the detailed record of this case, which spanned more than three-and-one-half years, does not bear out R.R.'s assertions.

***Elapse of one year since the child was removed from the parent's custody pursuant to a court order***

The first part of La. Ch.C. art. 1015(5) was clearly met: S.A. was removed from custody by an Instanter Order on December 30, 2019, over three years before the petition for termination of parental rights was filed.

### Substantial compliance with case plan

The second requirement of La. Ch.C. art. 1015(5) is that there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child.

Although the first priority in permanently placing a child is the return of the child to the legal custody of the parents within a specified time, for reunification to remain the permanent plan for the child, the parent must comply with the case plan and make significant measurable progress toward achieving its goals and correcting the conditions which necessitated the child to be in care. *State in Int. of K.W.*, 54,304 (La. App. 2 Cir. 1/12/22), 332 So.3d 825, 831, citing *State ex rel. J.B. v. J.B., Jr.*, 35,846 (La. App. 2 Cir. 2/27/02), 811 So.2d 179, 187, citing La. Ch.C. art. 702(C)(1). Mere cooperation by a parent is not the sole focus of the evaluation of a permanency plan. Rather, the courts must assess whether the parent has exhibited significant improvement in the particulars that caused the State to remove the children from the parent's care and custody. *Id.*, citing *State in the Interest of E.M.*, 51,511 (La. App. 2 Cir. 6/2/17), 224 So.3d 1122, citing *State in the Interest of P.B.*, 49,668 (La. App. 2 Cir. 12/17/14), 154 So.3d 806.

The record demonstrates that R.R. cooperated with DCFS and the case plan, and made progress up until the time that transition visitation was suspended in December of 2021. After that, her cooperation and progress noticeably decreased. The record reflects that she had left her relationship with E.B., III, who was noncompliant with his case plan, and had obtained secure appropriate housing in New Iberia. She had obtained mental health services and was on medication that she managed most of the time, and had completed the first parenting classes. She also obtained a job, working part-time at a McDonald's in New Iberia. The record shows that R.R. accomplished these goals despite the challenges of her intellectual

limitations, difficulty reading, dependence on Social Security disability payments for income, and not having a vehicle. Further, the DCFS caseworkers and the CASA volunteer all testified that G.F., the son who remained in R.R.'s custody, always appeared clean and well cared for when they visited.

However, R.R. did not take the initial steps to register for an assessment with OCDD, which delayed her receipt of services with that agency, and ultimately never received eligible services due to a combination of her delays in contacting OCDD and an agency backlog of cases due to the pandemic. Further, she enrolled in the Extra Mile parenting classes in 2022 after transitional visitation was suspended, but her case was closed due to non-completion of the course. On February 14, 2023, the Agency advised R.R. that she had not been compliant in meeting the mental health counseling and medication management requirements of her case plan, due to her having not taken her medication as prescribed, and due to her having missed scheduled mental health appointments on October 14, October 25, November 9, and November 23, 2022.

Upon review, we find that the record fully supports by clear and convincing evidence the trial court's factual findings that R.R. had not shown substantial compliance with her case plan over the three-and-a-half-year duration of this case.

### *Reasonable expectation of significant improvement in the parent's condition or conduct*

The bulk of the evidence at the termination trial concerned the third condition of La. Ch.C. art. 1015(5), that despite earlier intervention, there was no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and her need for a safe, stable, and permanent home. R.R. demonstrated intellectual limitations that impacted her ability to retain information, as noted by case workers who counseled her after she participated in parenting classes. R.R. relies in brief upon *State ex rel.*

*Ardoin Children*, 667 So.2d 1144 (La. App. 3 Cir. 1995), *writ denied*, 96-0796 (La. 5/17/96), 673 So.2d 609, 610, in support of her argument that her intellectual limitations should not prevent reunification. In that case, the Third Circuit reversed a termination of parental rights of a woman deemed unfit due to mental deficiencies. *Ardoin*, however, was decided under a previous version of La. Ch.C. art. 1015(5). Further, in that case, there was expert testimony that the mother could possibly experience improvement with intensive help. This expert testimony and evidence are lacking in the instant case.

Moreover, La. Ch.C. art. 1036(D)(1) specifically allows the court to consider evidence of "[a]ny physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior." There is no evidence that R.R.'s parental rights were terminated solely because she had intellectual limitations, as she charges in brief. Dr. Powanda conducted two evaluations of R.R. in the course of this case. R.R. underwent a thorough battery of testing both times, which results were largely consistent that she experienced some intellectual limitations. However, nowhere does Dr. Powanda state in her expert reports that R.R.'s intellectual limitations formed the sole basis for her recommendation against reunification. Dr. Powanda's two evaluations provided expert opinions supporting the trial court's factual conclusions that there was little or no reasonable expectation of significant improvement in R.R.'s conduct. The testimony and reports of the two DCFS caseworkers, the CASA volunteer, and R.R. herself showed the established patterns of behavior that exposed S.A. to a substantial risk of serious harm that provided the reason she was removed from R.R.'s home in the first place and prevented reunification. These patterns, as noted above, were R.R.'s history of

failing to exercising protective behavior towards S.A., and included living with a violent or abusive partner (E.B., III), taking little accountability for her actions or situations, being secretive and not forthcoming about other persons living in her home (boyfriend E. in New Iberia; friend S.B.), and her lack of compliance with her mental health counseling and medication management requirements of her case plan (as noted above).

The record reflects that R.R. had a history, both before and throughout this case, of living with people who were not safe or appropriate. She testified at the termination hearing that her boyfriend at the time this case opened, E.B., III, had been violent towards her. Moreover, he was implicated in the injuries that formed a basis for S.A. originally being taken into foster care. After R.R. moved to New Iberia, she met another man whom she allowed to move into her apartment with her other child and did not tell DCFS of his presence in her apartment. When DCFS learned of this other man and obtained his fingerprints, which revealed a past conviction for contributing to the delinquency of a minor, R.R. expressed that he had taken the charge for someone else and was innocent. Further, R.R. told her caseworker that as soon as the case was closed (presumably with reunification), she would allow him to move back into her apartment. R.R. also allowed S.B., a woman whom she had known since middle school, to move into her apartment and watch her son G.F. while she was at work, again failing to notify DCFS that she had allowed her to move in. Subsequent investigation of S.B. by DCFS showed that she previously had two children removed from her care.

Most concerning was R.R.'s resistance to any belief that S.A. had been touched inappropriately by her brother C.R., and moreover that she believed that S.A. had lied about it. At the outset, the DCFS caseworker testified that the allegations of sexual abuse could not be validated because the reported perpetrator, R.R.'s son C.R., was a minor and did not live in the home with R.R. She explained

that this was not the same as a finding that the incident did not occur. DCFS and Dr. Powanda expressed serious concern regarding R.R.'s refusal to believe in the possibility that C.R. could have touched S.A., which they testified indicated that R.R. would not be able to adequately protect S.A. from future potential abuse or other abusers.

The court was also troubled by R.R.'s apparent lack of concern of the seriousness of S.A.'s seizure disorder. R.R. claimed that S.A. had had seizures when she lived with her, and that she knew what to do about them. The record suggests that before S.A. had been removed from R.R.'s home, she had suffered febrile seizures, which were not the same as the recent seizures. R.R. displayed little interest in learning about S.A.'s seizure disorder or her medication from her foster mother.

Upon review, we find that R.R.'s contention that her parental rights were terminated due to her intellectual limitations are without merit. Rather, her parental rights were terminated because of clear and convincing evidence of the lack of reasonable expectation of significant improvement in her conduct in the near future. The trial court properly considered evidence of her intellectual limitations as a factor in this conclusion.

### Reasonable efforts of DCFS

R.R. also argues in brief that DCFS did not make reasonable efforts to reunify her and S.A. The record evidences the contrary. DCFS maintained close and regular contact with R.R. throughout the entire pendency of the case. DCFS provided her with transportation to in person visitations, her other appointments (such as mental health counseling and parenting classes), and to court hearings, because R.R. did not have a vehicle. The delays in R.R.'s securing stable housing did not inure to DCFS, nor did the initial delays in being accepted for services with OCDD. In both instances, R.R. had tasks that required her personal completion in

order to start or continue the application processes, which she did not do timely. The progress reports entered into evidence show regular contact between R.R. and her case workers and their support of her efforts.

Regarding R.R.'s ability to care for her son G.F., who was a year older than S.A. and who lived with her full time, the trial judge explained at the trial of the petition to terminate parental rights that the matter of G.F. was not before her; the only child before her in this proceeding was S.A.

Thus, the record amply demonstrates by clear and convincing evidence that R.R. had not exhibited significant improvement in the particulars that caused the State to remove the child from her care and custody. The trial judge was extremely familiar with the case, as she noted, and the record demonstrates regular, frequent, and thorough review hearings and several permanency hearings where the judge actively participated. We find that the trial judge's conclusions that the State proved the grounds of La. Ch.C. art. 1015(5) by clear and convincing evidence are not manifestly erroneous.

This assignment of error is without merit.

### SECOND ASSIGNMENT OF ERROR

R.R. next argues herein that the trial court erred by finding that termination was in the best interest of S.A. Upon review, we find that the trial court's conclusion that termination was in S.A's best interest was not manifestly erroneous.

As set forth above, Louisiana courts recognize a child's profound interest in terminating parental rights, as the presence of parental rights prevent adoption and inhibit the establishment of secure, stable, long-term, and continuous relationships found in a home with proper parental care. In balancing the parents' and the child's interests, the interests of the child are paramount over those of the parents. *State in Int. of A.V.*, *supra*, 164 So.3d at 862.

R.R. argues that this is not a case with a parent who cannot or will not provide a normal family home for her children, and, to the contrary, that she has consistently provided a stable home for G.F. for the past three years and nearly reunified with S.A. on three separate occasions.[8] We note, however, as did the trial court, that G.F. is not the child before the court in this proceeding. And we also note that there are no allegations that G.F. was touched inappropriately by his brother, nor evidence that he has serious medical issues like S.A.'s seizure disorder that require parental attention.

S.A. has been in the care of a foster family for more than three-and-a-half years. The record fully reflects the conditions that existed upon S.A. entering State custody. The testimony and evidence show that S.A. is thriving in her placement in her foster home with a parent who can provide a safe home and meet all of S.A.'s medical and emotional needs. The child's foster mother testified at the hearing that she and her partner wish to adopt S.A. if she were available for adoption. As the trial court noted, S.A. has been in foster care most of her young life, and deserves the permanency and safety that adoption will provide. Accordingly, we find no manifest error in the trial court's conclusion that it is in S.A.'s best interest that parental rights be terminated.

This assignment of error is without merit.

## DECREE

For the foregoing reasons, we affirm the judgment on appeal.

## AFFIRMED

---

[8] The record demonstrates that at the review hearings on June 24 and July 22, 2020, DCFS recommended that S.A. be returned to R.R.'s custody and that the case be staffed by Family Services. Both times, however, the trial judge rejected DCFS's recommendation and maintained custody with DCFS. It cannot be said, therefore, that these two occasions constituted "near" reunifications.

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**JANUARY 31, 2024** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES
NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

# 23-CA-491

## E-NOTIFIED
29TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE CONNIE M. AUCOIN (DISTRICT JUDGE)
JANE C. HOGAN (APPELLANT)          MELISSA W. BERNIARD (APPELLANT)          MARY R. MUSTALLER MCMILLAN
JEROME W. MATTHEWS, JR. (APPELLEE)  BENJAMIN R. MCDONALD (APPELLEE)          (APPELLEE)

## MAILED
NATALIE L. PAUL (APPELLEE)          ATOUNDRA P. LAWSON (APPELLEE)          HON. JOEL T. CHAISSON, II (APPELLEE)
ATTORNEY AT LAW                     ATTORNEY AT LAW                        DISTRICT ATTORNEY
1340 POYDRAS STREET                 POST OFFICE BOX 369                    TWENTY-NINTH JUDICIAL DISTRICT
SUITE 600                           LULING, LA 70070                      COURT
NEW ORLEANS, LA 70112                                                      POST OFFICE BOX 680
                                                                          HAHNVILLE, LA 70057