DREW, J.
| Terrance Brown, biological father of T.J. and legal father of A.B.,[1] appeals the termination of his parental rights as to these children.
We affirm.
I. BACKGROUND
T.J. was born on September 5, 2005. A.B. was born on February 22, 2008. On November 9, 2010, T.J. suffered second and third degree burns over 45% of her body.[2] At the time of her gruesome injuries, she was at home with her mother, Tabatha James, who was under the influence of drugs. A later investigation by the *487 Ouachita Parish Sheriffs Department revealed what appeared to be T.J.’s burned flesh in several areas of the home.
On November 9, 2010, an instanter order[3] was issued, removing both children from the home and placing them in the custody of the Department of Children and Family Services (“DCFS”).' At the time of issuance of the instanter order, both Terrance Brown and Antron Ellis were incarcerated, with Ellis serving a seven-year prison sentence.
The children were soon placed in foster care with the Greely family.
II. GUILTY PLEA
In January 2006, Brown pled guilty to criminal conspiracy to commit armed robbery and was sentenced to 15 years at hard labor, 12½ years of 12which were suspended with three years of supervised probation.
At the termination hearing, Brown was untruthful in his testimony about having entered a “best interests” plea to the charge of criminal conspiracy to commit armed robbery. The minutes clearly reflect that on January 31, 2006, he pled guilty to the crime, without reservations of any type. He fully and freely, with benefit of experienced counsel, admitted his guilt.[4] The minutes do not reflect any discussion of a plea pursuant to North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).
■•He waived delays and immediately received a sentence which, on its face, was illegally lenient.[5] His plea bargain resulted in a sentence of 15 years at hard labor, with 12½ years being suspended, subject to three years of probation upon his release from serving the initial 2⅜ years.[6] His probation was revoked on April 27, 2010.
Any sentence for armed robbery must be served without benefit of probation, parole, or suspension of sentence. Criminal conspiracy provides that a person who admits being a partner in a criminal conspiracy “shall be fined or imprisoned, or both, in the same manner as for the offense contemplated by the- conspirators; but such fine or imprisonment shall not |3exceed one-half of the largest fine, or one-half the longest term of imprisonment prescribed for such offense, or both.” (Our emphasis.)
While released on probation, Brown was arrested for aggravated burglary, criminal conspiracy to commit aggravated burglary, and possession of a firearm by a convicted felon. All of these charges were dismissed in exchange for his concession that he violated his probation. He is now serving the rest of the original 15-year sentence.[7]
At the May 2013 termination trial, a DCFS representative estimated that *488 Brown would serve another 11 years in prison. This testimony was unchallenged. If this is correct, Brown should be released in early 2024, at which time T. J. will be 18 years old. Her childhood will be long gone before her dad is released[8] from the penitentiary.
III. FURTHER EVENTS LEADING TO TERMINATION
DCFS filed a petition for involuntary termination of parental rights and certification for adoption on April 25, 2011, to which James consented.
Brown objected to the termination. The DCFS petition as to Brown was dismissed without prejudice on July 28, 2011, and a case plan was established with goals to be met by Brown so as to handle the basic needs of |4the children.[9] Brown’s case plan required that he:
• obtain and maintain housing for the children,
• complete a substance abuse evaluation,
• submit to random drug screens,
• complete anger management, and
• have consistent visitation with his children.
In November of 2011, the court found at a permanency hearing that:
• permanent adoption was in the best interest of the children; and
• continued placement in the Greely home was appropriate.
IV. TERMINATION PROCEEDINGS
On July 2, 2012, the state again filed a petition for the termination of Brown’s parental rights. The state alleged, and employees of DCFS later testified, that Brown had not completed any part of his case plan, had abandoned his children by failing to contribute to their care and support or maintain significant contact, and finally failed to inform DCFS of his transfers to new correctional facilities. Brown again would not agree to terminate his parental rights.
At the May 2, 2018, termination hearing, the court found that, by clear and convincing evidence, termination of parental rights was proper under La. Ch.Code art. 1015(4)(b) and (c), as well as (5) and (6).[10]
|fiV. GROUNDS FOR TERMINATION
DCFS proved, by clear and convincing evidence, all elements required by *489 La. Ch. C. art. 1015(4)(b) and (c), (5) and (6). The state need only prove one of the termination grounds in order to prevail. See State in Interest of WS, 626 So.2d 408 (La.App. 1st Cir.1993).
Our jurisprudence relative to termination is well settled.[11]
A.Failure to Support
La. Ch. C. art. 1015(4)(b) provides that parental rights can be terminated for failure to provide support for the children. The foster care | ^supervisor and worker both testified that during the 30 months of DCFS custody, Brown provided no contributions on behalf of the children. Brown admitted not supporting the children during their time in the care of DCFS. His only contribution was the one necklace— no food, clothing, or shelter. We acknowledge that he has been incarcerated during this entire time frame. He is responsible for committing the crime that resulted in his lengthy incarceration. He has shown no just cause for this failure to support.
B. Failure to Maintain Contact
Parental rights can be terminated for failure to keep in contact with the minor children for a six-month period. La. Ch. C. art. 1015(4)(c).
Brown knew that his minor children were in the custody of DCFS. Letoshia Ross, the foster care supervisor, testified that Brown was given the children’s address and phone number. Both DCFS witnesses mailed him correspondence routinely. Brown admitted he met Ms. Greely, the foster parent, and knew the children were in her home. Of the total of four letters sent to the children since they have been in DCFS custody, two were written in 2013, long after these proceedings were begun. Brown has made no effort to increase his contact with his children.
C. Failure to Comply
La. Ch. C. art. 1015(5) provides for termination if more than a year elapses with *490 no substantial parental compliance with a case plan.
T.J. and A.B. have been in the custody of the State of Louisiana since November 9, 2010, far exceeding the one-year threshold, during which time frame there has been precious little compliance with any of the case plans.
[7The foster care worker and her supervisor each testified that Brown failed to cooperate with DCFS to complete his case plan as to housing and employment. Brown blames his imprisonment for his lack of compliance. We recognize he was and is in prison. We nonetheless discern only feeble attempts to comply.[12]
While incarcerated, Brown did partake in some services, but did not |Rtimely apprise DCFS.[13]
D. No Reasonable Expectation of Significant Improvement
La. Ch. C. art. 1015(5) further provides that termination is indicated if there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
*491 The court looks for a reasonable expectation of reformation, found when the parent has cooperated with state officials and shown improvement; not all existing problems need be eliminated. State in Interest of S.M., 98-0922 (La.10/20/98), 719 So.2d 445. The court clarified that reformation is more than cooperation with state agencies, but rather a significant, substantial indication of reform, such as significantly modifying the behavior that caused the child’s removal from the home. Id.
La. Ch. C. art. 1001 states that proceedings should be conducted quickly to avoid delays in achieving permanency for the child and resolving the status of the parent. State ex rel. L.R.S., 38,812 (La.App.2d Cir.6/23/04), 877 So.2d 1040. The foster care supervisor testified that DCFS did not believe that Brown would rehabilitate in the near future.
E. Incarceration
Article 1015(6) states that parental rights can be terminated if the parent has been convicted or sentenced to incarceration for such a time period that the parent will not be able to care for the child, considering the lflchild’s age and needs. Brown’s probation was revoked and he is now serving the remainder of his 15-year sentence from his 2006 guilty plea.
La. Ch. C. art. 1036(E) states that a sentence of at least five years or more raises a presumption of that parent’s inability to care for the child, although incarceration alone is not sufficient to terminate parental rights. Brown’s failures as a father afford him no relief from this presumption:
• He had an opportunity to provide a reasonable plan for the children while they were in DCFS custody;
• He knew of the Cumulative Paternal Relative Resource form that allowed him to provide names of appropriate care givers for the children; and
• While Brown did attempt to provide ap- ■ propriate care givers for the children, his proffered alternatives to foster care were all found to be unsuitable.
YI. RESPONSE OF THE DEFENDANT
The defendant argues that:
A. No order of support was ever entered.
DCFS knew Brown was incarcerated and could not make substantial payments, if any, to the children. The foster care worker did not believe Brown had ever been taken to court for a child support hearing. Brown’s position on this point has some support in our jurisprudence.[14]
B. He tried to maintain significant contact with T.J.
Brown argues that:
1m* his case plan did not call for visitation;
• his visitation was suspended through a court order;
• he wrote letters to T.J.;
• he was denied prison visitation, and was able to visit T.J. only in court; and
*492 • no evidence was produced at trial establishing that Brown failed to communicate with the child for six consecutive months.
His two cited cases on this point are of little help to him.[15]
C. He tried to comply with the case plan.
Brown’s case plan did not call for visitation with T.J., though he did visit with the child in court and communicated with her by writing letters and sending a card for her birthday.
He in fact successfully completed the Northwest Regional Reentry Program, which included anger management, victim awareness, employment skills and job placement, all part of his case plan.
Brown further argues that:
• he made improvements in terms of the case plan by complying as much as he could, given his present condition;
• he is not the offending parent who injured his daughter;
• reunification has always been his goal; and
• he tried to supply relatives to care for the children.
lnD. His prison sentence should not be a basis for termination.
Brown’s sentence is considerably longer than the five years that triggers a presumption that he is unable to care for his children. See La. Ch. C. art. 1036(E). His testimony at trial of a possible early release was speculative in the extreme.
Brown is not a victim of his prison sentence. He entered the plea of guilty and received a 15-year sentence. He conceded he had violated the terms of his supervision. His own felonious conduct has taken him away from his children.
E. The children’s best interests require the denial of termination.
Our jurisprudence acknowledges that termination is an unusually strong remedy in response to poor parenting.[16]
Brown agrees that his incarceration prohibits a traditional relationship with his children, but he has fought to save his *493 parental rights. He argues that his children deserve a loving relationship with at least one parent.
11?VII. ANALYSIS
When a court is given the task of determining if termination of parental rights is proper, it conducts a two-part inquiry.[17]
La. Ch. C. art. 1037(A) provides that when the grounds in any paragraph of art. 1015 are proven true and termination is in the best interest of the child, such termination shall be ordered. This record overwhelmingly supports termination.
We are not persuaded by Brown’s arguments.
He has had minimal contact with T.J. and A.B. In fact, T.J. believed Brown was deceased until a therapist told her otherwise.
Brown described his pre-incarceration relationship with the children as moderate. He last saw the children face to face in July 2012.
Since she suffered life-threatening injuries, the only constants in T.J.’s life have been her brother and her foster parents.
Brown admitted that he has had very little communication with T.J. and A.B. in the past 2⅜ years. It is therefore no surprise that the foster care supervisor testified that he lacks a parental bond with the children.
11sThere is no manifest error in the trial court’s termination of Brown’s parental rights. The children need permanent placement with, and adoption by, the Greelys.[18]
Brown had well over two years to complete his case plan. He failed to make reásonable efforts to do so. These children should not have to wait any longer, as there is no reasonable hope that Brown will ever complete the case plan or become a responsible parent.
*494 Despite Brown’s protestations to the contrary, T.J. and A.B. need to be freed from the limbo of foster care. The trial court was eminently correct to rule in favor of the needs of the children, over the needs of a wayward parent. The children deserve the permanency of adoption[19] into a loving and capable family.
DECREE
The ruling of the trial court is AFFIRMED.

. Antron Ellis is the biological father of A.B.

. The child was burned by hot oil from the stove. The mother then scalded the child in the bathtub, and failed to get medical assistance for the child.

. One of the comforts in reviewing this case is that the same dedicated judge handled these matters from start to finish, affording the trial court enhanced knowledge of this sad situation. We particularly appreciate the trial court’s kindness to these children.

. He entered a plea to a violation of La. R.S. 14:26 (Criminal Conspiracy) and La. R.S. 14:64 (Armed Robbery).

. Brown’s sentence included these provisions:
(1)he was sentenced to 15 years at hard labor, with no mention that his sentence had to be served without benefit of suspension of sentence, probation or parole;
(2) he received a suspended 12.5-year prison sentence, which is not lawful; and
(3) he was placed on supervised probation, which is unlawful for the crimes admitted.

. If Brown had stayed out of trouble, this disposition would have greatly inured to his benefit.

. The "in the same manner as for the offense contemplated” language found in La. R.S. 14:26(C) has been interpreted to mean that if the sentence for the completed offense has to be served without benefits, then so does the sentence for the conspiracy. State v. Moore, 96-1835 (La.App. 1st Cir. 1997), 696 So.2d *488 657. The Moore court relied upon analogous language in our attempt statute [La. R.S. 14:27(E) ] that also provides that any sentence be served “in the same manner as for the offense attempted.” Further, in State v. Lawson, 43,655 (La.App.2d Cir. 10/22/08), 997 So.2d 122, the defendant was, like Brown, convicted of criminal conspiracy to commit armed robbery and sentenced to 15 years at hard labor. This court noted on error patent review that the sentence was required to be served without benefits. Thus, the bottom line for Brown is that none of his sentence is subject to early release.

. TJ. was born on September 5, 2005; she will turn 18 on September 5, 2023.

. The trial court approved several case plans, each with similar conditions and goals.

. Art. 1015. Grounds
The grounds for termination of parental rights are:
[[Image here]]
(4) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following;
(a) * * *
(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child’s care and support for any period of six consecutive months.
(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.
(5) Unless sooner permitted by the court, at least one year has elapsed since a child was *489 removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
(6) The child is in the custody of the department pursuant to a court order or placement by the parent; the parent has been convicted and sentenced to a period of incarceration of such duration that the parent will not be able to care for the child for an extended period of time, considering the child's age and his need for a safe, stable, and permanent home; and despite notice by the department, the parent has refused or failed to provide a reasonable plan for the appropriate care of the child other than foster care.

. A parent cannot avoid providing financial support simply because he or she was not ordered to do so in the case plan. State ex rel. B.H. v. A.H., 46,864, (La.App.2d Cir. 10/24/07), 968 So.2d 881. The juvenile court determines whether the intent of a parent is to permanently avoid parental responsibility and abandon the child. State in Interest of J.K., 97-336 (La.App. 3d Cir. 10/29/97), 702 So.2d 1154. Once abandonment is proven, the parents who seek to avoid termination of their parental rights must prove just cause- for abandonment, which is a justifiable excuse for failure to provide for the child’s care and support. State in the Interest of ML, 95-0045 (La.9/5/95), 660 So.2d 830. A parent who intends to exercise his or her parental rights must take action to avoid the termination of those rights. State in Interest of S.M., 98-0922 (La. 10/20/98), 719 So.2d 445. Louisiana courts have held that incarceration is not a just cause defense for failure to support. State ex rel. B.H. v. A.H., supra.

. La. Ch. C. Art. 1036, provides factors for consideration in this inquiry.
Art. 1036 Proof of parental misconduct
A. The admissibility of the conviction of a parent is governed by the Code of Evidence.
B. A prior conviction may be proved by certified copy of the judgment of conviction or certified copy of the minute entry of conviction.
C. Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
(1) The parent's failure to attend court-approved scheduled visitations with the child.
(2) The parent’s failure to communicate with the child.
(3) The parent's failure to keep the department apprised of the parent’s whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
(4) The parent's failure to contribute to the costs of the child’s foster care, if ordered to do so by the court when approving the case plan.
(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent’s lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
E.Under Article 1015(6), a sentence of at least five years of imprisonment raises a presumption of the parent’s inability to care for the child for an extended period of time, although the incarceration of a parent shall not in and of itself be sufficient to deprive a parent of his parental rights.

. There is no requirement under art. 1015(5) or art. 1036 of the Children's Code that DCFS prove reasonable efforts to accommodate case plans approved by the trial court. Brown had the opportunity to raise the issue of his incapability to adhere to the case plan prior to the case plan being approved.

. In State ex rel. B.H. v. A.H., 42,864, (La.App.2d Cir. 10/24/07), 968 So.2d 881, this court found that when the case plan did not call for financial contributions and there had been no requests for financial contributions, the court was in error in finding the state had met its burden on this single issue.
In State ex rel. A.L.D., 2009-0820 (La.App. 3d Cir.11/4/09), 21 So.3d 1109, the court con-eluded that the State cannot agree that there is no support obligation unless one is assessed by Support Enforcement and then use SupPort Enforcement s failure to assess an amount of support as a basis for the termination of parental rights.

. In State ex rel. C.A.C., 2011-1315 (La.App. 4th Cir.2/1/12), 85 So.3d 142, writ denied, 2012-0388 (La.3/7/12), 83 So.3d 1048, the court concluded that a finding of abandonment was not supported under art. 1015(4)(c) when the father spoke to the child on the phone and was brought to visit his father almost every week during his incarceration.
In State ex rel. H.G., 2008-657 (La.App. 3d Cir. 11/5/08), 997 So.2d 819, the court found that although it was certain that the father had not visited the child during his incarceration of 5⅛ months, it was uncertain when the last visit prior to the incarceration was, and thus, art. 1015(4)(c) was not met.

. In State ex rel. J.A., 1999-2905 (La. 1/12/00), 752 So.2d 806, the court stated that the best interest of the parent and child must be balanced, and the parent's interest warranted "great deference and vigilant protection under the law.” Courts are advised to use caution because the termination of parental rights is one of the most drastic actions of the state. Id.
Courts have recognized that a child has a fundamental right to know and love his parents. In re Billeaud, 600 So.2d 863 (La.App. 3d Cir. 1992).
Natural rights between parents and children are reciprocal and should not be denied, except when a parent has proven himself to be unworthy of the child’s love. In re Adoption of B.G.S., 556 So.2d 545 (La.1990).
Parental rights are a fundamental liberty interest that deserves great protection under the law. State in Interest of Q.P., 94-609 (La.App. 3d Cir. 11/2/94), 649 So.2d 512.
The termination of parental rights must be proven by clear and convincing evidence, an onerous burden for the state. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); State in Interest of JML, 540 So.2d 1244 (La.App. 3d Cir. 1989).

. The court must find, by clear and convincing evidence, that one of the art. 1015 grounds for termination is met. State ex. rel. J.M., 2002-2089 (La. 1/28/03), 837 So.2d 1247. After the court finds one of these grounds is met, the court must determine whether the termination of parental rights is in the best interest of the child. La. Ch. C. art. 1037(B); State ex rel. J.M., supra.
To determine the best interest of the child requires the court to consider the child’s interest above the parent's. State ex rel. J.M., supra. The determination of best interest is within the discretion of the trial court and is made by the trier of fact considering the totality of circumstances. The finding of best interest of the child is entitled to great deference and is subject to review for manifest error. State ex rel. J.M., supra.
Children need permanency and stability. See State ex rel. D.S.C. v. J.C.R., 35,893 (La. App.2d Cir.2/27/02), 811 So.2d 198. The best chance of permanency is to be freed for adoption. Indefinite placement in foster care does not further the best interest of the child. See State ex rel. J.M., supra. The court is designed to protect parental rights along with the right of the child to thrive and survive, with the parental rights yielding to the best interest of the child. State in the Interest of S.M., supra.

. La. Ch. C. art. 1037(B) requires a consideration of the child’s attachment to his current caretakers. T.J. and A.B. have been with the foster parents for a very long time. DCFS presented ample strong evidence that the best interest of the children requires the parental rights of the father be terminated. The children are in need of a permanent and loving home. When adopted by the Greelys, they will have it. Each child has a close bond with each other, as well as their prospective adoptive parents and their 16-year-old daughter. The children have lived in this home for two years. They should not be forced to wait an indefinite time for Brown to serve his sentence and possibly rehabilitate when they are currently thriving in their current situation.

. La. Ch. C. art. 1001 states that termination of parental rights is the first step toward placement in a permanent home. The goal is to achieve a permanent placement that will ensure safety, stability and welfare of the child. The trial court chose this type of permanent placement for T.J. and A.B.