CHAISSON, J.
b The State of Louisiana, Department of Children and Family Services (“DCFS”), appeals the juvenile court judgment that denied its petition to terminate the parental rights of S.M., W.H., G.W., and C.B. to their children, M.M. and T.B.[1] For the following reasons, we affirm.
FACTS AND PROCEDURAL HISTORY
The children involved in this termination proceeding are M.M., whose date of birth is September 15, 2001, and T.B., whose date of birth is February 27, 2003. S.M. is the mother of these two ■ male children; W.H. is the alleged father of M.M.; G.W. is the biological father of T.B, although C.B. is listed on the birth certificate as the father.
The two minor children, M.M. and T.B., first came to the attention of DCFS in September of 2012, when C.A., a friend of S.M.’s, contacted the agency to report that S.M. left the children with him and moved to Texas. C.A. had apparently agreed to keep the children temporarily with the understanding that S.M. would provide money for food and necessities. C.A. tried contacting • S.M. several times but was unsuccessful, and he thereafter requested that DCFS remove the children from his home. On September 24, 2012, the children were placed in the custody of DCFS, and the matter was set for a continued custody hearing.[2] At the October 2, 2012 hearing, the juvenile court found that reasonable grounds existed to believe that the children were in need of care and that continued custody was necessary for their safety and protection.
On October 16, 2012, the Jefferson Parish District Attorney’s Office filed a petition pursuant to La. Ch.C. art. 606(A)(2) and (A)(3) seeking to have the children adjudicated in need of care as to their mother, S.M. The petition alleged Rthat “the children are victims of neglect” and “are without necessary food, clothing, shelter, medical care, or supervision because of the disappearance or prolonged absence of their parent.” At the November 13, 2012 adjudication hearing, S.M. stipulated that the children were in need of care, without admitting the allegations of the petition. *1024 The disposition hearing was conducted on December 11, 2012. The court determined that continued custody of the children was necessary and maintained their placement with their cousin, T.H., noting that the children were doing well. However, on January 11, 2013, M.M. and T.B. were removed from their placement with their cousin because she could not handle the children’s behavior. They were then placed in the certified foster home of Mr. and Mrs. P.
According to the reports in the record, the behavior of the boys improved once they were placed with Mr. and Mrs. P. While the experienced foster family embraced the boys, they also provided them with a structured environment, set forth rules and boundaries, and told them exactly what was expected of them in the home setting. At the review hearing on March 12, 2013, the court maintained the boys’ placement with Mr. and Mrs. P., noting that the boys were adjusting well and making progress behaviorally in the foster home. The court further observed that S.M. was working toward her case plan goals and had completed her mental health assessment, was taking her medication, had enrolled in parenting classes, and had maintained contact with her children. Subsequent reports showed the boys’ continued improvement. In particular, a report by their therapist, Dr. Danna Andrus, noted that since M.M. and T.B.’s placement with Mr. and Mrs. P., they both had shown measurable progress with their behavior, enjoyed the idea of being part of a family that is stable, secure, and consistent, and wanted to stay in their current placement. In addition, according to a report by DCFS, S.M. continued to make progress toward her case plan goals. She had completed her parenting ^classes, had visited with her children as scheduled, and wanted her children to return to her home.
In light of the mother’s measurable progress, the court, at the September 17, 2013 review hearing, returned the legal custody of M.M, and T.B. to their mother. The reports in the record, as well as the minute entry/judgment from the October 15, 2013 status hearing, suggest that S.M. continued to cooperate with DCFS and to comply with her case plan. In addition, the boys were apparently happy to be back with their mother. However, on January 16, 2014, DCFS filed a motion to set a status hearing based on a change of circumstances. In particular, the motion referenced S.M.’s failure to comply with a court order and failure to respond to the school’s attempts to contact her about the boys. The motion was granted and set for a hearing on January 21, 2014. After considering the testimony presented, the court treated the matter as an instanter hearing on a modification of disposition and ordered that M.M. and T.B. be placed in the custody of DCFS. It is noted that S.M. did not appear at this hearing despite efforts to notify her of the hearing date.
Pursuant to the court’s order, DCFS immediately filed a motion for modification of disposition alleging a change in circumstances. The motion alleged that S.M. allowed the children to have contact with C.A. against the court’s order and that S.M. had been unresponsive to the school’s request for assistance with M.M.’s academic and behavioral progress. At the January 23, 2014 modification of disposition hearing, the court maintained custody of M.M. and T.B. with DCFS and also ordered the mother, who was present, to fully comply with her case plan. After custody was placed with DCFS, the boys were returned to the certified foster home of Mr. and Mrs. P. and have remained there since that time.
| thereafter, the matter came for regular review hearings. The progress reports *1025 and minute entries/judgments in the record indicated that the two boys were happy with their placement with Mr. and Mrs. P., that M.M. continued to struggle academically and behaviorally and steps were being taken to address those issues, and that generally the boys’ behavior improved, and they were calmer, more settled, and happier. The reports further indicated that S.M. had made no progress on her case plan goals, and that while Mr. and Mrs. P. did not want to adopt the boys, they were willing to have the boys live with them permanently. In accordance with the information received, the juvenile court, at the review hearings, continued the children in the custody of DCFS. During these proceedings, the case plan goal had developed into placement in an alternative permanent living arrangement (“APLA”); however, in January of 2016, DCFS expressed its desire to change the case plan goal from APLA to adoption. At the January 19, 2016 review hearing, the juvenile court did not approve the plan of adoption and ordered DCFS to explore other case plan goals.
Thereafter, on February 19,2016, DCFS filed a motion for reconsideration of the ease plan goal and requested again that the court change the case plan goal from APLA to adoption. In the motion, DCFS maintained that adoption is the permanent plan that is in the best interest of the children. DCFS asserted that since reunification is not an option due to the mother’s total non-compliance with her case plan goals, adoption is the next preferred placement for the children pursuant to La. Ch.C. art. 702. Further, DCFS asserted that placement in the least restrictive, most family-like alternative permanent living arrangement is limited to children sixteen years of age or older and therefore is not an option in this case. The minute entry from the March 29, 2016 status hearing indicates that the court only approved the change in the case plan goal of adoption by Mr. and Mrs. P. and 1 Bnoted that it was not in the best interest of the children to be moved from Mr. and Mrs. P.
Ón May 19, 2016, pursuant to La. Ch.C. art. 1015, DCFS filed a petition to terminate the parental rights of S.M., W.H., C.B., and G.W. to their children, M.M. and T.B.[3] The petition alleged that the children were abandoned by their parents, that the parents failed to comply with their case plans, and that there existed no reasonable expectation of significant improvement in the parents’ condition or conduct in the near future. The parties subsequently denied the allegations contained in the petition.
The matter came for hearing on September 12 and October 4,' 2016. Several witnesses testified at the hearings, and the court additionally took notice of the underlying child in need of care proceeding. S.M. was called as the first witness. She testified that she had knowledge of her case plan and told Elizabeth Frein, the case worker for DCFS, that she was interested in reunification and was willing to do whatever was necessary to get her two boys back. During her testimony, however, she admitted that she did not comply with her case plan. S.M. acknowledged that she has not seen her children in person in about two years but maintains regular contact with them through social media. She further testified that she has a job but has not paid any child support as required by *1026 her case plan. Additionally, S.M. completed one parenting class but never attended the Tulane Parenting Program to which she was referred. S.M. further acknowledged that she missed some court hearings. Although she stated that she could not take the boys until she found a bigger house, she now has a job, is able to do what is required of her, and would like an opportunity to work her case plan to be reunited with M.M. and T.B.
16Mrs. P., the foster mother, also testified at the termination hearing. According to Mrs. P., the boys have been in her home for about three years and are doing great. She has seen improvement with the boys since their placement with her. Particularly, with regard to M.M., he was very much out of control when he first moved into her home, but he is now much improved. Mrs. P. informed the court that she has been working with M.M. and his teachers, he goes to the doctor and takes his medication, and he was placed in self-contained classes at school. Mrs. P. explained to the judge that although she does not want to adopt or obtain legal guardianship of the boys, she is committed to these boys and is willing to keep both of them until they can go back home or be adopted. However, if neither happens, she is willing to keep them until they reach the age of majority. She further testified that the boys are stable and bonded to each other, that they feel safe and want to stay with her, and that, in her opinion, it would be devastating for the boys to be pulled from her home and placed in another foster home.
Ms. Frein, the DCFS social worker for the two boys, testified that, when she received the case in July of 2014, she contacted S.M. and discussed the case plan with her. According to Ms. Frein, S.M. seemed to understand the requirements and indicated that she was not interested in reunifying with the boys. Ms. Frein informed the juvenile court that S.M. has not complied with any aspects of her case plan. In particular, S.M. last visited with the boys in May of 2014, did not make parental contributions, did not attend the treatment and rehabilitation services offered by DCFS, did not maintain contact with DCFS, and did not attend court hearings.
In addition to testifying about S.M.’s non-compliance with her case plan, Ms. Frein testified about the placement options for the boys and expressed the opinion of DCFS that it is in the children’s best interest to be freed for adoption. She explained that reunification was not an option because none of the parents |7made any efforts to reunify or stated any intent to even wanting to reunify with the boys, that Mr. and Mrs. P. did not want to adopt or obtain legal guardianship of the boys, and that DCFS searched but was unable to find any relatives for adoptive placement. Ms. Frein acknowledged during her testimony that the boys are not interested in being adopted and that she would move the children from their current placement only if an adoptive home the boys were interested in was found. Ms. Frein further acknowledged that the boys were doing well with Mr. and Mrs. P. and that then-behavior and educational performance, especially M.M.’s, have improved. Further, she recognized that Mr. and Mrs. P. are providing the boys with a family-like, safe, and stable placement, that long-term foster care would not necessarily be a bad option for the boys, and that she is not opposed to working with the mother and referring her back to parenting classes and other services needed to complete her case plan.
Myrtis Fisher, an adoption specialist with DCFS, testified about adoption procedures in general and stated that by federal mandate, she now has to recruit adoptive *1027 families for children under the age of sixteen even if the children do not want to be adopted. However, she maintained that if the children felt uncomfortable, she would not force them to move into the prospective adoptive home. Ms. Fisher acknowledged that long-term foster care could be in the best interest of the child in certain circumstances.
Both boys also testified at the termination hearing. T.B. informed the judge that he likes living with Mr. and Mrs. P. and that they provide him with love, care, food, and shelter. He further told the judge that he wants to stay in his current placement, that he does not want to be adopted, and that he wants to have a relationship with his mom. M.M. likewise told the judge that he likes living with the P. family, that they provide him with everything he needs, and that he feels safe there. M.M. asserted that he has no interest in being adopted by anyone, he likes 1 shying with his brother in their current placement, and he wants to be able to communicate with his mom and possibly have visitation with her and his other siblings.
At the termination hearings, evidence was also taken regarding the boys’ fathers. With regard to W.H., the alleged father of M.M., the court-appointed curator served him with a letter and talked to him about the nature of the impending termination proceeding. He stated that he was not the child’s biological father, and he did not show up at the hearing despite being notified. Ms. Frein of DCFS also made regular attempts to contact W.H. but was unsuccessful until approximately two weeks before the hearing when she spoke to W.H.’s sister on the phone. Based on the address provided by his sister, Ms. Frein made further attempts to contact W.H. Although she was never able to personally speak to him, he left her a message to stop sending letters. When she then called his phone number, a woman answered and.told her not to call the number again. W.H. has had no contact with M.M. and has never provided him with any monetary support.
With regard to C.B., DNA testing proved that he was not T.B.’s biological father. He thereafter did not want any involvement in the case, and he had no contact with, nor provided any support to T.B. With regard to G.W., DNA testing proved him to be the biological father, of T.B.; however, he surrendered his parental rights.
After considering the evidence presented and the arguments of counsel, the juvenile court denied the State’s. petition to terminate parental rights. In so ruling, the juvenile court determined that the State proved by clear and convincing evidence the statutory grounds for termination of parental rights; however, the trial court thereafter found that termination was-.not in the best interest of the children. It is from this ruling that DCFS now appeals.
|nOn appeal, DCFS contends that the juvenile court committed reversible error in denying the petition for termination of parental rights based on a finding that adoption is not in the children’s best interest. DCFS asserts that the juvenile court’s finding was motivated by its desire to have APLA as a case plan for the children, which is not allowed by state or federal law for these children since they are under the age of sixteen. DCFS reasons that since reunification, guardianship; custody, and APLA are not possible case plans for the children, adoption is the only case plan in the best interest of the children, and therefore, the termination should have been granted in order to free the children for adoption. Further, DCFS contends that this court should review the. matter de novo because the juvenile court committed an error of law in believing that its denial *1028 of the termination petition could override the provisions of state and federal law that prohibit APLA as a case plan for children under the age of sixteen.' For the reasons that follow, we find no merit to the arguments of DCFS and accordingly affirm the judgment of the trial court that denied the petition to terminate parental rights.
DISCUSSION
La. Ch.C. art. 1015 provides the specific statutory grounds by which a court may involuntarily terminate the rights and privileges of parents. In order to terminate parental rights, the court must find that the State has established at least one of the statutory grounds by clear and convincing evidence. La. Ch.C. art. 1035(A). Further, even upon finding that the State has met its evidentiary burden, a court still must not terminate parental rights unless it determines that to do so is in the child’s best interest. La. Ch.C. art. 1037(B); State ex rel. H.A.B., 10-1111 (La. 10/19/10), 49 So.3d 345, 368; State in Interest of A.V., 14-465 (La.App. 5 Cir. 10/29/14), 164 So.3d 853, 857, writ denied, 14-2489 (La. 2/27/15), 160 So.3d 963.
In this case, there is no question that the State proved the statutory grounds for termination , alleged in the petition. As noted by the juvenile court, the State | ipproved by clear and convincing evidence that since M.M. and T.B. were again taken into custody by DCFS in January of 2014, S.M. has failed to make any measurable progress on her case plan and has failed to both maintain significant contact with and provide support for M.M. and T.B. With regard to the fathers, C.B. and W.H., the State also proved by clear and convincing evidence that they failed to maintain any contact or pay any contributions toward the care of M.M. and T.B. As further noted by the trial court, M.M. and T.B. have been physically, emotionally, and financially abandoned by their parents.
We now turn our attention to the second and most important part of the inquiry in a termination proceeding, that being the best interest of the children. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parents should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. State ex rel. J.A., 99-2905 (La. 1/12/00), 752 So.2d 806, 811. As such, the primary concern of the courts ’and the state remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. State in Interest of A. V., 164 So.3d at 856-57. According to La. Ch.C. art. 1037(B), the consideration of best interest of the child shall include consideration of the child’s attachment to his current caretakers.
The determination of best interest is within the discretion of the trial court and is made by the trier of fact considering the totality of the circumstances. State in Interest of T.J., 48,612 (La.App. 2 Cir. 9/11/13), 124 So.3d 484, 493, n.17. InWhether termination of parental rights is warranted is a question of fact, and a district court’s factual determination will not be set aside in the absence of manifest *1029 error.[4] In applying the manifest error standard, an appellate court seeks to determine whether the record reflects the district court was clearly wrong. State ex rel H.A.B., 49 So.3d at 368; State in Interest of A.V., 164 So.3d at 857. Based on our thorough review of the record, we are unable to conclude that the juvenile court was clearly wrong in its finding that termination of parental rights was not in the best interest of these children.
It is evident from the juvenile court’s reasons for judgment that the best interest of the children were of paramount concern. In her extensive reasons for judgment, the juvenile court judge stated as follows:
M.M. is currently fifteen years old and his brother T.B. is thirteen years old. They have lived with the P. family for the vast majority of the last almost four years. Dr. Andrus describes the P. family as a “more professional therapeutic home where the parents are seasoned veterans in their craft as professional parents.” The P. family, however, does not wish to adopt the boys. Mrs. P. testified “I don’t want to adopt, but my home is open, loving and caring. And I want it to be that way so if the occasion arises that maybe one day they could go back home to their parents or someone came up to adopt them.. .but what I am all about is keeping them and loving them and nurturing them until this happens. And if it doesn’t happen, I get to keep them.
When the boys first came into DCFS custody in 2012, they were described as living a “nomadic lifestyle” and their cousin and initial placement asked that they be removed from her home because the boys were “so out of control” and not amenable to discipline. Both boys were struggling behaviorally and academically. The boys’ therapist since January of 2013, Dr. Andrus, consistently praised the P. family and the progress that the boys have -made behaviorally and academically while in their home. She noted that the P.’s “have created a behavior plan that works for both boys.”
During this time with the P. family, M.M.’s'behavior and scholastic performance has improved. Dr. Andrus noted that she has seen a “vast improvement” in M.M. since he was placed with the P.’s. | ^Throughout the history of this -ease, M.M. has struggled academically, however, since being placed with the P. family, he now receives special education services, was placed in a self-contained class room, his grades have “dramatically improved”, and he has passed the seventh grade. Since Mrs. P. took custody of M.M., she has noted that his behavior continues to improve as well. She testified on September 12, 2016 that at first, “M.M. was very much out of control and I’ve been working with him, his teachers, he goes to the doctor and he takes his medication and now he’s much improved.” She also testified that M.M. “has been taken out of the self-contained class for two classes.. . so he’s able to go out.. .with other kids so that’s a great improvement.”
[T.B.] ’s behavior has also improved since his placement with the P.’s. Dr. Andrus noted that [T.B.] “appears to be *1030 more in control of himself and less likely to misbehave in a defiant manner,” that she has seen “an improvement” in T.B., and that at the. P.’s house he was “involved in a new behavior management program that appears to keep him under control.” In April of 2015, Dr. Andrus also noted that T.B. was making “measurable progress in the schpol setting.” At the July 19, 2016 review hearing, it was noted that there had been no behavioral issues with T.B.
Since being placed with the P.’s in 2012 and again in 2014, both boys have made it clear that they feel safe in the P. household and they wish to stay there. Dr. Andrus reported that T.B. “stated repeatedly that he likes where he is living and he wished he could stay there.” She also noted that M.M. “appears to enjoy the stability of their family, he likes the fact that there is consistency in his life now and looks forward to living life on a schedule.” Dr. Andrus further opined that “both boys enjoy the idea of being a part of a family that is stable, secure, and one that provides consistency.” In 2015, Dr. Andrus noted that both boys “are comfortable in the P. household and feel that they are an active part of the family.” The boys have also repeatedly expressed their desire to remain with the P. family to their CASA advocate. Mr. Saxer’s reports to the court repeatedly related that “both boys are progressively calmer, more settled and happier [and that] without hesitation, each said that they wanted to live with Mrs. P.” In each of her repox-ts to the court, Dr. Andrus noted that in each of her sessions with the boys, they expressed their desire to remain with the P. family. Further, on September 12, 2016, both boys testified that they wish to remain with Mrs. P., and that they did not wish to be freed for adoption by anyone else.
... T.B. and M.M. have been faced with tremendous challenges in their lives. Over the past four years in their placement with the P. family they have matured and made significant progress academically and have worked to correct their negative behaviors. These strides perhaps would not have been made but for Mrs. P. and her family’s love, support, guidance, and stability. The boys are happy in the home, are doing better in school, and absolutely do not wish to be moved to another home.
| iaMrs. P. has stated repeatedly that while she does not wish to adopt the boys, she does wish to continue to love and nurture them in her home. The boys have repeatedly stated to their therapist, their CASA worker, their case worker, and the court that they wish to remain with the P. family. In his youth transition plan, which was filed for the record on March 29, 2016, M.M. stated that Mr. and Mrs. P. “help me with everything. They listen to me and support me. I want to live with them at least until I turn eighteen and then possibly after. I want to always maintain contact with them even when I am grown.” Mrs. P. has indicated that she will take care of the boys until they reach eighteen. It should also be noted that one reason Mrs. P. does not wish to adopt the boys is because she wishes to have the support of the state and the court, if necessary. Considering that both children have had behavioral issues in the past and that it took a court order to ensure M.M. was receiving the educational services to which he is entitled, Mrs. P.’s concerns are valid. It is in the best interest of the boys that their [sic] remains the possibility state involvement in their lives should they need further assistance, (emphasis in original)
*1031 In her reasons for judgment, the juvenile court judge focused on the.children’s attachment to the foster family, their continued improvement while in the care of Mr. and Mrs. P., and their desire to remain with the P. family. These factors are appropriate considerations in determining the best interest of the children. For example, in discussing the trial court’s best interest determination, the appellate court, in State ex rel. B.B., 11-252 (La.App. 3 Cir. 6/8/11), 67 So.3d 1268, 1274, writ denied, 11-1812 (La. 8/31/11), 68 So.3d 517, noted the ease worker’s testimony that two of the three children have remained together in the same foster care placement for two years, that the children were thriving and had bonded with their foster parent, and that the foster parent wanted to adopt them. Considering these factors, the appellate court determined that the record supported the trial court’s finding that termination of parental rights was in the children’s best interest. Likewise, in upholding the trial court’s best interest determination in State in Interest of T.J., supra, the appellate court considered in part the children’s attachment to their current caretakers. The court found that the evidence was sufficient to establish the termination of the father’s parental rights in favor of adoption by the children’s foster parents was in the children’s best interest. The 114 court noted that the children were in need of a permanent and loving home, that the children were bonded with each other, with their foster parents, and with the foster parents’ teenage daughter, that the children had lived in foster placement for two years at the time of the termination proceeding, and that the children were thriving in foster placement. Id., 124 So.3d at 493, n. 18.
Also, this court in State in Interest of A.V., 164 So.3d at 862, discussed the children’s relationship with their foster parents in determining that termination was in the best interest of the children. This court noted that the children had been out of the home and in the care of a foster family for three and one-half years. The record reflected the physical, behavioral, developmental, and nurturing deficits the children possessed upon entering state custody. All testimony and evidence indicated that the children were now flourishing with their placement in their foster home, physically, emotionally, and developmentally. The children’s foster mother testified at the hearing that she and her husband wished to adopt the children.
In these cases, the courts looked to the children’s attachment to their foster families and their progress in their placement to support a determination that termination was in the best interest of the children in order to free them for adoption by the foster parents who expressed a desire to adopt them. However, in this case, because of the unique set of circumstances, these factors support the juvenile court’s finding that the termination of parental rights is not in the best interest of M.M. and T.B. Specifically, these two children are older, want to'remain together, have bonded with the foster family, want to live with them, and have significantly improved behaviorally and academically while in their care. The foster parents have likewise obviously bonded with the children and are committed to keeping them until they reach at least the age of majority. Contrary to the previously discussed cases, the foster parents, for valid reasons, do not wish to adopt the two boys or obtain legal guardianship of them. The trial court |1sobviously considered all these circumstances in determining that termination was not in the best.interest of the children.
Considering the juvenile court’s intimate familiarity with all aspects of this proceeding, including the history of the case, the relationships and attachments between the *1032 parties, and the children’s progress since they were originally taken into state custody, and the extensive reasons for judgment that reflect that the juvenile court painstakingly considered the best interest of the children and the ramifications of the termination of parental rights on them welfare, we find no manifest error in its conclusion that termination of parental rights is not in the children’s best interest.
On appeal, DCFS also indirectly challenges the case plan goal of APLA in light of state and federal law that disallow APLA as a ease plan goal for children under the age of sixteen. We first note that DCFS appealed from the judgment of termination, and the boys’ case plan goals are not controlling of our determination of whether the juvenile court erred in denying the petition to terminate. Further, in this proceeding, DCFS developed, and the court adopted, the case plan goal of APLA before the change in the law that prohibited APLA as a permanent placement for children under the age of sixteen. Therefore, it was an acceptable case plan goal for the boys at the time it was implemented.
Accordingly, for the reasons set forth herein, we affirm the judgment of the juvenile court that denied the petition of DCFS to terminate the parental rights of S.M., W.H., G.W., and C.B. to their children, M.M. and T.B.
AFFIRMED

. Pursuant to Rules 5-1 and 5-2 of the Uniform Rules-Courts of Appeal, the initials of the parties will be used to protect the identity of the minors.

. It is noted that J.M., a female child of S.M., was also taken into state custody at this' time. While she was a party in the child in need of care proceeding, she is not involved in the termination proceeding now being appealed.

. La. Ch.C. art. 1004.1 provides: "The department shall file and pursue to judgment in the trial court a petition to terminate the parental rights of the parent or parents if the child has been in state custody for seventeen of the last twenty-two months, unless the department has documented in the case plan a compelling reason why filing is not in the best interest of the child.”

. DCFS argues that this court should review the matter de novo because the juvenile court committed an error of law in believing that its denial of the termination petition could override the provisions of state and federal law that prohibit APLA as a case plan for children under the age of sixteen. We find no merit to this argument as the juvenile court applied the correct test in ruling on the petition to terminate parental rights. The fact that the law prohibits APLA as a case plan for these children is not dispositive of the best interest determination by the juvenile court.